
FILED

Mar 29 2017, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B.A., <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | March 29, 2017 <br><br> Court of Appeals Case No. <br> 49A02-1606-JV-1474 <br><br> Appeal from the Marion Superior <br> Court, Juvenile Division <br><br> The Honorable Scott Stowers, <br> Magistrate <br><br> The Honorable Marilyn A. <br> Moores, Judge <br><br> Trial Court Cause No. <br> 49D09-1602-JD-234 |

**Brown, Judge.**

[1] B.A. appeals the juvenile court's true finding that he committed delinquent acts which, if committed by an adult, would constitute false reporting, a level 6 felony, and institutional criminal mischief as a class A misdemeanor. B.A. raises one issue which we revise and restate as whether the court abused its discretion in admitting into evidence certain statements, which he alleges were obtained in violation of his constitutional right against self-incrimination. We affirm.

## Facts and Procedural History

[2] On Friday, February 5, 2016, Officer Paul Tutsie, Chief Administrative Officer for the Metropolitan School District of Decatur Township School Police Department who worked primarily at the high school, received a call that one of the janitors at Decatur Middle School discovered a message written in pink marker on the wall of one of the boys' restrooms at the school reading: "I will got [sic] a bomb in the school Monday 8th 2016 Not a joke." State's Exhibit 1. Officer Tutsie, "immediately went into investigative mode, took it as a credible . . . threat" that was "ongoing." Transcript at 63. That evening, Officer Tutsie took pictures of the scene and reviewed footage from a hall camera to identify who was responsible. By the end of Friday evening, he had narrowed his search to four individuals that could have possibly been involved. The next day, Officer Tutsie met with Decatur Middle School Principal Val Barrantine for help identifying the four persons he had narrowed the search to from the video data. Officer Tutsie also showed photos to Vice Principal Missy Harvey

to identify the individuals. By the end of the weekend, they had two "very viable suspects," one of whom was B.A. *Id.* at 66.

[3] On Monday morning, February 8, 2016, Vice Principal Al Remaly conducted a sweep of the school with School Resource Officers Lyday and Wheeler and determined there was no immediate threat. Afterwards, Remaly went back to his office and met with Officer Tutsie and Officer Lyday, who was primarily stationed at the elementary schools, to discuss how to handle the situation and specifically to "try to . . . handle everything as a school matter first." *Id.* at 13. Officer Tutsie suggested that the buses be boarded by both administrators and police officers to remove the suspects from the buses. They planned for the two school administrators, Remaly and Harvey, to board the buses "along with the . . . officers[] to get the students off the bus, bring them into school to separate areas, and start [their] investigation." *Id.* at 14.

[4] When the buses arrived at the school, Remaly and Officer Lyday boarded the school bus B.A. was on, removed B.A., and brought him into Remaly's office, which is large and L-shaped. Officer Wheeler, who was primarily stationed at the middle school, went with Harvey to remove the other student suspect and took that student to Harvey's office. Remaly sat at his desk, and B.A. sat in a chair in front of the desk. Officer Lyday stood about five feet to the left of B.A. and out of B.A.'s direct line of sight. Remaly asked B.A. if he knew why he was there, and B.A. responded that he had no idea. Early on in the questioning, Officer Tutsie entered the room and took the spot where Officer

Lyday was standing, and Officer Lyday backed up. Officer Lyday later sat at the conference table in the office about seven to ten feet behind B.A.

[5] Meanwhile, Harvey engaged in questioning with the other student while in the presence of Officer Wheeler. The questions were posed at Harvey's discretion. She also obtained a handwriting sample from the student. After speaking with the student for about five or six minutes, she determined that he was not involved in making the threat. Harvey then went to Remaly's office where he was still speaking with B.A. Officer Wheeler also went to Remaly's office, arriving a few minutes ahead of Harvey, and he sat down at the conference table when Harvey arrived.

[6] Remaly directed the interview with B.A. the entire time. B.A denied writing on the bathroom wall several times. At one point, Officer Lyday said to B.A.: "Come on, bud, let's just- let's- let's- can we just get- tell the truth and answer the questions." *Id.* at 54. Officer Tutsie handed a handwriting "scenario sample" that he had prepared to Remaly. *Id.* at 74. Remaly soon after handed it back to Officer Tutsie, who then passed it to B.A. at Remaly's direction. Officer Tutsie "explained" to B.A. that he needed B.A. "to fill out exactly how it was written on the paper." *Id.* at 74. After B.A. copied the scenario sample, Officer Tutsie examined it, handed it to Remaly, and Remaly compared it to a picture of the bathroom wall writing, circling letters from the scenario "that kinda matched the picture . . . ." *Id.*

[7] After comparing the writings, Remaly came to the conclusion that B.A. wrote the threat on the bathroom wall and said to B.A. that the handwriting looks similar and asked him "why did you do it?" *Id.* at 120. B.A. then started to cry and responded: "I don't know. I'm sorry." *Id.* At that point, Remaly decided to move B.A. to the main office and call B.A.'s mother. The meeting in Remaly's office lasted approximately fifteen minutes.

[8] B.A.'s mother arrived and asked B.A. what he did, and B.A. started to cry and said "I don't know, mom, I'm- I'm sorry." *Id.* at 122. He indicated that it was a joke and he did not know why he did it. Remaly decided to suspend B.A., pending expulsion, and then met in the hallway with the officers and informed them of his decision, and he noted it was up to law enforcement to determine what they wanted to do. Remaly later returned to the office and informed B.A. and his mother of his decision. Afterwards, Officer Tutsie and Officer Lyday discussed the potential legal ramifications with B.A. and his mother and made a decision to arrest B.A. He was ultimately expelled from the school as a result of the incident.

[9] On February 9, 2016, the State alleged B.A. to be a delinquent child for false reporting, an act which would be a level 6 felony if committed by an adult, and for institutional criminal mischief, an act which would be a class A misdemeanor if committed by an adult. On May 18, 2016, B.A. filed a motion to suppress statements he had made. A denial hearing commenced the same day, at the outset of which the parties discussed whether to proceed as a hearing on a motion to suppress or a denial hearing. The court ruled to "handle the

trial as normal" but to consider B.A.'s motion to suppress when raised at the hearing. *Id.* at 7.

[10]  During the direct examination of Remaly, defense counsel objected when Remaly began testifying about his questioning of B.A. and, after asking preliminary questions, moved to suppress the evidence of the conversation due to a violation of B.A.'s *Miranda* rights. Defense counsel also objected during the testimony of Officer Tutsie and argued that the investigation was "generated" by Officer Tutsie to determine whether an individual had committed a crime. *Id.* at 93. Defense counsel highlighted that the office had up to six adults, that B.A.'s parent was not present, and that there was not an advisement of rights. The prosecutor responded that "[t]here was an ongoing threat," that "[t]here was a school purpose to talk to this student" and the other student, and that it was a "matter of school safety." *Id.* at 96. The prosecutor argued that, with the exception of a few statements by officers, the interview was conducted by Remaly to determine whether there was "a credible ongoing threat . . . ." *Id.* After hearing arguments, the court briefly recessed and, following recess, denied B.A.'s motion, ruling that

> the investigation and questioning was led by . . . Remaly, um, either Officer Tutsie or one of his, uh colleagues was present. Uh, there's really no indication that, uh, Officer Tutsie or any of the police or school resource officers was feeding him questions or otherwise pulling his strings in an effort to circumvent Miranda.

*Id.* at 104. Following the court's ruling, the hearing adjourned for the day. The hearing resumed on June 6, 2016, at which the court entered findings of true on both allegations.

### *Discussion*

[11] The issue is whether the court abused its discretion in admitting into evidence B.A.'s inculpatory statements. The admission and exclusion of evidence is a matter within the sound discretion of the trial court, and we will review only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001).

[12] "A juvenile charged with delinquency is entitled to have the court apply those common law jurisprudential principles [that] experience and reason have shown are necessary to give the accused the essence of a fair trial." *S.G. v. State*, 956 N.E.2d 668, 674 (Ind. Ct. App. 2011) (quoting *In re K.G.*, 808 N.E.2d 631, 635 (Ind. 2004) (citing *In re Gault*, 387 U.S. 1, 30, 87 S. Ct. 1428 (1967))), *trans. denied*. "Without question, these include . . . the constitutional privilege against self-incrimination . . . ." *Id.* In order to protect "the right against self-incrimination, the United States Supreme Court's opinion in *Miranda v. Arizona*,[1] established that the prosecution may not use statements, whether

---

[1] 384 U.S. 436, 86 S. Ct. 1602 (1966).

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* (internal quotations omitted). Such procedural safeguards include an advisement to the accused that he has the right to remain silent and that anything he says can be used against him. *Id.*

[13]     Also, this court has repeatedly observed that "[t]he special status accorded juveniles in other areas of the law is fully applicable in the area of criminal procedure." *Id.* (quoting *S.D. v. State*, 937 N.E.2d 425, 429 (Ind. Ct. App. 2010), *trans. denied*). "To give effect to that status in the context of waiving intricate, important, and long established Fifth . . . Amendment rights, we require that a juvenile be afforded a meaningful opportunity to consult with a parent or guardian before the solicitation of any statement." *Id.* That is, in cases where a juvenile is subject to custodial interrogation, such child must be read his rights under *Miranda*, and the State must obtain the waiver of such rights pursuant to the juvenile waiver statute found at Ind. Code § 31-32-5-1.[2] *Id.* at 674-675.

---

[2] Ind. Code § 31-32-5-1 provides:

> Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
>
> > (1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;
> >
> > (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
> >
> > > (A) that person knowingly and voluntarily waives the right;

[14] It is undisputed that B.A. was neither read his *Miranda* rights nor given the opportunity to have a meaningful consultation with a parent or guardian. "As a general rule, however, *Miranda* warnings and the juvenile waiver statute attach only where a subject is both in custody and subject to interrogation." *Id.* at 675; *see also P.M. v. State*, 861 N.E.2d 710, 713 (Ind. Ct. App. 2007) ("Miranda warnings are only required, however, where a suspect is both in custody and subjected to interrogation." (citing *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S. Ct. 1682 (1980))). To determine whether a defendant is in custody, we generally ask whether a reasonable person under the circumstances would consider himself free to resist the entreaties of the police. *P.M.*, 861 N.E.2d at 713 (citing *White v. State*, 772 N.E.2d 408, 412 (Ind. 2002)). "Interrogation has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements." *S.G.*, 956 N.E.2d at 675. "Under *Miranda*, 'interrogation' includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." (quoting

---

(B) that person has no interest adverse to the child;

(C) meaningful consultation has occurred between that person and the child; and

(D) the child knowingly and voluntarily joins with the waiver; or

(3) by the child, without the presence of a custodial parent, guardian, or guardian ad litem, if:

(A) the child knowingly and voluntarily consents to the waiver; and

(B) the child has been emancipated under IC 31-34-20-6 or IC 31-37-19-27, by virtue of having married, or in accordance with the laws of another state or jurisdiction.

*White*, 772 N.E.2d at 412 (citing *Innis*, 446 U.S. at 301, 100 S. Ct. 1682)). The United States Supreme Court has held that the safeguards outlined in *Miranda* also apply to the functional equivalent of interrogation by the police. *Id.* (citing *Innis*, 446 U.S. at 301-302, 100 S. Ct. 1682; *Robey v. State*, 555 N.E.2d 145, 148 (Ind. 1990)).

[15] Whether a person was in custody depends upon objective circumstances, not upon the subjective views of the interrogating officers or the subject being questioned. *Id.* (citing *Gauvin v. State*, 878 N.E.2d 515, 520 (Ind. Ct. App. 2007), *trans. denied*). For an interrogation to be custodial in nature, one does not necessarily have to be under arrest. *Id.* To be custodial in the non-arrest context, the interrogation must commence after the person's freedom of action has been deprived in any significant way. *Id.* at 675-676; *see also id.* at 676 (citing *Luna v. State*, 788 N.E.2d 832, 833 (Ind. 2003) ("When determining whether a person was in custody or deprived of his freedom, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.")). This is determined by examining whether a reasonable person in similar circumstances would believe he is not free to leave. *Id.* at 676 (citing *Luna*, 788 N.E.2d at 833). "It is well established in the caselaw defining 'interrogation' and 'custody' that the two cannot exist without the presence of a law enforcement officer." *Id.* (quoting Elizabeth A. Brandenburg, *School Bullies–They Aren't Just Students: Examining School Interrogations and the Miranda Warning*, 59 MERCER L. REV. 731, 734 (2008) (citing *Miranda*, 384 U.S. at 478, 86 S. Ct. 1602)).

[16]     B.A. argues that this court recognized in *S.G.* that questioning by a school officer, in conjunction with the presence of police officers, may constitute a custodial interrogation and that the circumstances of this case rise to that level. Appellant's Brief at 20 (citing *S.G.*, 956 N.E.2d at 679). He asserts that the police drove the investigation when Officer Tutsie reviewed and gathered evidence for identifying suspects, Officer Lyday boarded the bus with Remaly to remove B.A. and escorted him to Remaly's office, and B.A. was not free to leave during the questioning. He notes that, at one point, he was questioned while surrounded by three uniformed officers and two administrators. B.A. also asserts that it was Officer Tutsie who handed B.A. the handwriting sample and instructed him to copy it and that Officer Lyday told him to "tell the truth." *Id.* at 21. B.A. further argues that his age weighs in favor of finding a *Miranda* violation. *Id.* at 23 (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 264-265, 131 S. Ct. 2394, 2398-2399 (2011)).

[17]     The State argues that the evidence reveals Remaly led the interrogation and B.A. was not free to leave because he was talking to a school administrator in the administrator's office about a serious disciplinary matter. The State asserts that "without the active involvement of law enforcement, it was not a custodial interrogation for purposes of triggering *Miranda* or the requirements of the juvenile waiver statute." Appellee's Brief at 11. The State argues that Officer Lyday made a single comment about telling the truth, and Officer Tutsie "spoke only to explain to B.A. how to fill out the handwriting sample at Remaly's direction." *Id.* at 13. It asserts that Remaly obtained handwriting samples in

advance of the interview and did the handwriting comparison. The State contends that Remaly was attempting to keep the school safe and to determine an appropriate school disciplinary punishment, that there was no evidence Remaly was acting as an agent of law enforcement, and that the mere presence of the officers does not transform the interview into an action by law enforcement. The State also points out that the officers were largely out of B.A.'s sight during the interview when they sat behind him at a conference table.

[18]    This Court has previously provided thorough analysis of the law concerning the issue presented in *S.G.* In that case, a teacher was using a staff restroom at the Coleman Alternative Education Center when her iPhone was stolen from her handbag which had been left on the restroom counter. *S.G.*, 956 N.E.2d at 672. The teacher notified the principal, Linda Gagyi, of the theft, and Gagyi notified Officer Stevan Guynn with the Indianapolis Public School System Police Department. *Id.* Officer Guynn reviewed surveillance footage, which revealed that T.C., a female student at the school, had been the only person in the restroom at the same time as the teacher, prompting Gagyi to speak with T.C. *Id.* The next day, S.G. "appeared on the 'radar'" as someone who might also be involved in the phone's disappearance. *Id.* At Gagyi's request, Officer Guynn found S.G. and directed him to the principal's office, where Gagyi and Officer Guynn sat with S.G. for a meeting. *Id.* Only Gagyi asked S.G. questions about the phone. *Id.* S.G. was not given *Miranda* warnings or an opportunity to speak with his parent or guardian. *Id.* at 672-673. S.G. made

incriminating statements and was suspended. *Id.* at 673. About three months later, the State filed a petition of delinquency alleging that S.G. was a delinquent child because he had committed receiving stolen property, a class D felony if committed by an adult. *Id.*

[19] On appeal, this Court made the following observation regarding analyzing whether a juvenile is in custody for purposes of *Miranda* under circumstances where the juvenile is questioned at school while in the presence of a police officer:

> A school with a traditionally tutelary principal and one with a taser firing officer stand at opposite ends of a spectrum with respect to the degree and nature of force to which students may be subjected. *Miranda* claims at either end are fairly easy to address. A principal acting alone and without invoking or outwardly benefiting from the authority of any law enforcement officer may question a student without complying with *Miranda's* requirements. A student's answers to such questions will be admissible at subsequent juvenile or criminal proceedings. On the other hand, a police officer who acts in a traditional law enforcement mode—for example arranging for a student to be removed from class, handcuffed, and placed in a closed office alone with the officer—must advise the student of her rights before questioning the student. If the officer fails to do so, any statements made by the student will not be admissible in juvenile or criminal proceedings. The challenges for courts will come from the array of cases that fall between these two extremes. The modern alignment between educational and law enforcement authorities requires courts to determine whether and when a principal's questioning [is] subject to *Miranda* and how an officer's part-time assignment at the front of a crowded classroom should affect the analysis of the officer's subsequent interrogation of a lone student in a closed office.

*Id.* at 676 (quoting Paul Holland, *Schooling Miranda: Policing Interrogation in the Twenty-First Century Schoolhouse*, 52 LOY. L. REV. 39, 41 (2006)).

[20] We also summarized prior Indiana cases that addressed the issue of whether a student was in custody when questioned at his or her school, including *State v. C.D.*, 947 N.E.2d 1018 (Ind. Ct. App. 2011); *G.J. v. State*, 716 N.E.2d 475 (Ind. Ct. App. 1999); and *S.A. v. State*, 654 N.E.2d 791 (Ind. Ct. App. 1995), *trans. denied*, *disapproved of on other grounds by Alvey v. State*, 911 N.E.2d 1248, 1250 (Ind. 2009).[3] *Id.* at 676-678. In each case, the court on appeal held that there was no *Miranda* violation. In *S.A.*, the court found that "there was no coercive atmosphere to protect against" and that "the questioning took place in the school building, by the vice-principal, and a major portion of it occurred in the presence of the student's father." *Id.* at 677 (citing *S.A.*, 654 N.E.2d at 797). In *G.J.*, juvenile G.J. was questioned by the dean in the dean's office regarding whether he had brought marijuana to school and there was no violation of G.J.'s rights. *Id.* (citing *G.J.*, 716 N.E.2d at 477). The record did not indicate whether an officer was in the office during the questioning. *Id.* (citing *G.J.*, 716 N.E.2d at 477).

[21] In *C.D.*, a high school student suspected of being "under the influence of some substance" was brought to the principal's office, and the principal asked for the

---

[3] The Court also discussed *S.D.*, noting that whether the juvenile was in custody was not at issue in that case and rather the issue on appeal concerned whether S.D.'s rights were violated when the State failed to comply with the juvenile waiver statute. 956 N.E.2d at 678.

assistance of Officer Chad Richhart, who was a "'drug recognition evaluator,' to determine what substance C.D. might have taken." 956 N.E.2d at 677. Officer Richhart examined C.D. in the principal's office in which only those three individuals were present, and following the examination he told the principal that C.D. was under the influence of marijuana that had been smoked that day. *Id.* C.D. stated that he had not smoked marijuana that day but did so the previous night, the principal suspended C.D. from school, and then the principal searched C.D.'s backpack and discovered two pills identified as Adderall, a controlled substance. *Id.* The principal handed the pills to Officer Richhart and called C.D.'s mother. *Id.* The State thereafter filed a delinquency petition related to the discovery of the pills on the school's campus. *Id.*; *C.D.*, 947 N.E.2d at 1020-1021. The trial court suppressed the evidence of the pills based upon the juvenile waiver statute, but this Court reversed, stating:

> [T]his case resembles that of *G.J.* The environment in which
> C.D. was questioned was no more coercive than in *G.J.*, as both
> were questioned at school. C.D. was not free to leave [the
> principal's] office, but he was detained by [the principal] for an
> educational purpose, which was to keep possibly intoxicated
> students out of the classroom. Furthermore, C.D. admitted to
> drug use without being directly questioned on that point by
> Richhart or [the principal]. After the examination, [the principal]
> told C.D. he would be suspended from school, which further
> demonstrates that C.D.'s examination was intended to carry out
> an educational function or school purpose, not to further a
> criminal investigation.
>
> We note that in C.D.'s case, unlike in G.J., C.D. was examined
> by a school security officer in police uniform rather than a school

administrator. Under the circumstances of this case, we conclude that this difference is not significant. Richhart was not independently investigating the matter. Instead, Richhart examined C.D. at [the principal's] request and in [the principal's] presence. Furthermore, after the examination was complete, [the principal] did not immediately ask Richhart to take C.D. into custody but instead advised C.D. that he would be suspended. This evidence indicates that Richhart was acting to fulfill an educational purpose. Therefore, the fact that Richhart, rather than [the principal], examined and questioned C.D. did not transform the examination into a custodial interrogation.

Consequently, we conclude that C.D. was not undergoing custodial interrogation when he answered Richhart's questions and made an incriminating admission, and the *Miranda* warnings and safeguards in Indiana Code section 31-32-5-1 (1997) are inapplicable here. Thus, C.D. was not deprived of his right to meaningful consultation with his parents when Richhart examined him.

*S.G.*, 956 N.E.2d at 677-678 (quoting *C.D.*, 947 N.E.2d at 1022-1023).

[22] In addition to the Indiana cases, we observed in *S.G.* that "other states have extended the concept of custody to school situations in which a school official, rather than a police officer, does the questioning, holding that the officer's pervasive presence can 'significantly increase[] the likelihood [that the juvenile] would produce an incriminating response to the principal's questioning.'" *Id.* at 678-679 (quoting S.G.'s Appellant's Brief at 9 (citing *In re K.D.L.*, 700 S.E.2d 766, 772 (N.C. Ct. App. 2010))).

In *S.G.* we stated that "under certain circumstances a police officer's presence in conjunction with a school official's questioning may be significant enough to constitute the type of setting that we would characterize as custodial" but that the facts in that case did not satisfy the requirements of a custodial interrogation. *Id.* at 679. In making this determination, we noted that S.G. was seventeen years old and had participated in a "'metro expulsion' program," that the principal contacted Officer Guynn and asked him to bring S.G. to her office, that S.G. was asked one question by the principal about the whereabouts of the iPhone, and that upon hearing the answer the principal decided to suspend S.G. and called S.G.'s parents. *Id.* We noted that Officer Guynn, although present, did not provide or ask questions or otherwise participate in the meeting, and his presence was consistent with his duty "of being responsible for the 'safety and security of the students and staff' . . . ." *Id.* We further observed that "[t]here is no evidence that Officer Guynn's presence was threatening," that "[h]e was not separately investigating who had taken" the phone, and that indeed S.G. was not taken into custody and did not have a delinquency petition filed against him for two months following the incident. *Id.*

We also observed a then-recent decision by the United States Supreme Court, *J.D.B. v. North Carolina*, 564 U.S. 216, 131 S. Ct. 2394 (2011), in which the Court "held that a child's age also is a proper consideration in the *Miranda* custody analysis, so long as the child's age was known to the officer at the time of police questioning or would have been apparent to a reasonable officer." *Id.*

at 680 n.9; *see also J.D.B.*, 564 U.S. at 276, 131 S. Ct. at 2406 ("Reviewing the question *de novo* today, we hold that so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test."). The *J.D.B.* Court noted that the child's age may not "be a determinative, or even a significant, factor in every case," but that "[i]t is . . . a reality that courts cannot simply ignore." 564 U.S. at 276, 131 S. Ct. at 2406.

[25] In this case, then thirteen year old B.A. was removed from the bus on Monday morning by Remaly and Officer Lyday and was brought to Remaly's office, a large, L-shaped office, as opposed to the office of the school resource officers. B.A. sat in a chair in front of Remaly's desk and faced Remaly, who questioned him. Officer Lyday initially stood to the side of B.A. before taking a seat at the conference table located about seven to ten feet behind him. Officer Tutsie then took Officer Lyday's spot standing to the side of B.A. At some point, both Vice Principal Harvey and Officer Wheeler joined the others in Remaly's office. Remaly directed the questioning about the incident, and B.A. initially denied writing on the bathroom wall. At one point, Officer Lyday told B.A. to tell the truth. After Officer Tutsie entered the room, he handed Remaly a handwriting scenario sample that he had prepared, and Remaly looked it over. Remaly then handed it to Offcier Tutsie and asked the officer to give it to B.A. and explain to B.A. how to complete the scenario. At Remaly's direction, Officer Tutsie went over with B.A. how to fill out the paper. After B.A. completed it, Officer Tutsie

handed it to Remaly, who compared it with the writing found on the bathroom wall, circling letters from the scenario "that kinda matched the picture . . . ." Transcript at 74. Remaly then again asked B.A. "why did you do it," and B.A. started to cry and responded: "I don't know. I'm sorry." *Id.* at 120. At that point, Remaly decided to move B.A. to the main office and called B.A.'s mother to ask her to come to the school. After B.A. had been allowed to speak with his mother, Remaly told them that he had decided to suspend B.A., pending expulsion. Remaly also met in the hallway with the officers and informed them of his decision and noted it was up to law enforcement to determine what they wanted to do. The officers afterwards made the decision to arrest B.A.

[26] Like in previous cases in which we found the juvenile was not subject to custodial interrogation, the questioning of B.A. was performed by a school administrator in the administrator's office. Although B.A. was not free to leave, he was detained for an educational purpose, namely, to make sure the school was safe from explosives. Like in *C.D.*, although a test may have been administered by an officer during the questioning, such test was done at the request of the school administrator and the officer did not otherwise ask the juvenile questions.

[27] Also, as for Officer Tutsie's testimony that he "immediately went into investigative mode, took it as a credible . . . threat" that was "ongoing," *id.* at 63, and investigated through the weekend by reviewing video and identifying possible suspects, the United States Supreme Court has made clear that aspects

of an investigation which have not been communicated to the individual in question do not impact the inquiry into whether that individual is in custody. *See Stansbury v. California*, 511 U.S. 318, 323-324, 114 S. Ct. 1526, 1529 (1994) ("[U]nder Miranda '[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time'; rather, 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151 (1984))). There is no evidence that B.A. was made aware of Officer Tutsie's investigation or of Officer Tutsie's advice to remove him from the bus. Had these actions been conveyed in some fashion to B.A., however, they would then become relevant to the analysis. *See id.* at 325-326, 114 S. Ct. at 1530 (noting that "[o]ur cases make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned *(assuming those suspicions remain undisclosed)* is not relevant for purposes of *Miranda*") (emphasis added).

[28] Finally, we do not believe that *J.D.B.* warrants reversal in this matter. In that case, J.D.B. was removed from class by a uniformed police officer and was questioned by officers "for at least half an hour." 564 U.S. at 265, 131 S. Ct. at 2399. Although the assistant principal was present during the questioning, the record revealed that officers did most of the questioning and the assistant principal's role was only to encourage J.D.B. to "do the right thing" and warning J.D.B. that "the truth always comes out in the end." *Id.* at 266, 131 S. Ct. at 2399. As noted, the questioning of B.A. was performed by Remaly in his

office. The Court's holding in *J.D.B.* does not apply personally to Remaly who, as a school administrator, was under no duty to advise B.A. of his constitutional right against self-incrimination. *See S.G.*, 956 N.E.2d at 676 (quoting Brandenburg, *supra*, at 734 ("It is well established in the caselaw defining 'interrogation' and 'custody' that the two cannot exist without the presence of a law enforcement officer.")). Again, although we recognize that circumstances may exist in which questioning by a school administrator coupled with the presence of police officers require the officers to administer *Miranda* warnings, we do not believe that these facts so required.

We conclude that the juvenile court correctly denied B.A.'s motion to suppress and admitted his statements made in response to Remaly's questions.

### Conclusion

For the foregoing reasons, we affirm the juvenile court's admission of B.A.'s statements.

Affirmed.

Vaidik, C.J., and Bradford, J., concur.