



FILED

Jun 20 2018, 11:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N  T H E

# Indiana Supreme Court

Supreme Court Case No. 49S02-1709-JV-567

## B.A.,

*Appellant (Respondent),*

–v–

## State of Indiana,

*Appellee (Petitioner).*

---

Argued: October 30, 2017 | Decided: June 20, 2018

Appeal from the Marion Superior Court, Juvenile Division,
No. 49D09-1602-JD-234
The Honorable Marilyn A. Moores, Judge
The Honorable Scott B. Stowers, Magistrate

On Petition to Transfer from the Indiana Court of Appeals,
No. 49A02-1606-JV-1474

---

**Opinion by Chief Justice Rush**

Justices David, Massa, Slaughter, and Goff concur.

**Rush, Chief Justice.**

The vital mission of educating our youth requires schools to daily provide safety, security, and student discipline. In recent decades, schools have turned to resource officers for help. These officers protect students and staff, offer mentorship—and, yes, help with discipline and criminal investigations. As their presence has grown, so too have questions of students' constitutional rights. Today we address for the first time one of those questions: when are students entitled to *Miranda* warnings at school?

Here, in response to a bomb threat on a bathroom wall, thirteen-year-old B.A. was escorted from his bus and questioned in a vice-principal's office. Officers hovered over B.A. and encouraged him to confess, but no one gave him *Miranda* warnings.

We hold that B.A. was in police custody and under police interrogation, so he should have been Mirandized. We therefore reverse his delinquency adjudications.

## Facts and Procedural History

Scribbled in pink marker in a Decatur Middle School boys' bathroom came the threat: "I will Got A bomb in the school Monday 8th 2016 not A Joke." School Resource Officer Tutsie "immediately went into investigative mode" and soon narrowed the suspects to two students—including thirteen-year-old B.A.

The next Monday, February 8, 2016, school resource officers and administrators walked through the school and found it safe. Then, when B.A.'s bus arrived, Vice-Principal Remaly and School Resource Officer Lyday removed B.A. from his bus and escorted him to Remaly's office.

B.A. sat in front of Remaly's desk while Officer Lyday stood a few feet away. Early in B.A.'s interview, Officer Tutsie came in and took Officer Lyday's spot while Officer Lyday moved to sit at a conference table behind B.A. Around that same time, a third school resource officer—

Officer Wheeler—came in and sat at the conference table. All three officers wore police uniforms.

Vice-Principal Remaly led the interview, asking if B.A. knew why he was there. B.A. maintained that he did not. To see if B.A.'s handwriting matched the bomb threat, Officer Tutsie handed B.A. written sentences and told B.A. how to copy them.

After B.A. copied the sentences, Remaly decided that the handwriting sample matched the threat and asked B.A. why he did it. Then Officer Lyday interrupted to say, "Come on, man, just—just tell the truth." B.A. started crying, lowered his head, and said "I don't know. I'm sorry." Remaly then ended the interview—which had lasted fifteen minutes—and called B.A.'s mother. When she arrived and asked B.A. what happened, he told her, "I'm sorry mom, it was a joke" and admitted that it was a dumb thing to do.

With these admissions, Remaly suspended B.A. from school, pending expulsion. He then turned B.A. over to the school resource officers, who arrested him and took him to the Marion County Juvenile Detention Center.

The State alleged that B.A. was delinquent for committing false reporting, a Level 6 felony if committed by an adult, and institutional criminal mischief, a Class A misdemeanor if committed by an adult. B.A. moved to suppress the evidence from his interview, arguing that he was entitled to *Miranda* warnings since he was under custodial interrogation and that officers failed to secure waiver of his *Miranda* rights under Indiana's juvenile waiver statute. *See* Ind. Code § 31-32-5-1 (2017). After a hearing, the juvenile court denied the motion and found B.A. delinquent on both counts.

B.A. appealed, and the Court of Appeals affirmed. *B.A. v. State*, 73 N.E.3d 720, 730 (Ind. Ct. App. 2017). It held that *Miranda* warnings were not required because a school administrator questioned B.A. for an

educational purpose. *Id.* We granted transfer, vacating the Court of Appeals opinion. Ind. Appellate Rule 58(A).[1]

## Standard of Review

We review the admission of B.A.'s incriminating statements for an abuse of discretion. *See Snow v. State*, 77 N.E.3d 173, 176 (Ind. 2017). But the underlying issue—whether B.A. was under custodial interrogation—is purely legal and entitled to de novo review. *See State v. Brown*, 70 N.E.3d 331, 335 (Ind. 2017). We thus first address whether B.A. was in police custody and then whether he was under police interrogation.

## Discussion and Decision

The parties agree that *Miranda* warnings protect students at school but disagree whether B.A. was entitled to the warnings. The critical inquiry is whether he was under custodial interrogation. B.A. argues that he was in custody under the totality of the circumstances and that he was interrogated because police officers participated in his interview. The State responds that the officers' presence was noncoercive and that they did not directly question B.A.

We start by exploring how *Miranda* ties into modern schools' efforts to stay safe and crime-free. We then explain the tests for police custody and police interrogation in a school setting and apply them to the undisputed facts here. We conclude that because B.A. was under custodial

---

[1] We held oral argument in Evansville at the University of Southern Indiana. We thank the university for its outstanding hospitality; the parties for their travel and excellent advocacy; and the students from the Academy for Innovative Studies, Benjamin Bosse High School, Boonville High School, Crawford County Junior–Senior High School, Evansville Day School, Early College High School, New Tech Institute, Randall T. Shepard Leadership and Law Academy, Signature School, St. Philip School, and Tecumseh High School for their respectful attention and insightful questions.

interrogation yet not Mirandized, his incriminating statements should have been suppressed. The juvenile court therefore abused its discretion.

# I. *Miranda* warnings protect students under custodial interrogation.

## A. The modern school setting.

Our schools face the monumental task of shielding students from an array of dangers in order to provide safe learning environments. Partnering with school resource officers is a key part of that effort; sworn law enforcement officers protect nearly half of the country's public schools.[2]

These officers wear many hats. They ensure school safety and mentor and educate students, but they also investigate crimes and make arrests.[3] *See* Ind. Code §§ 20-26-18.2-1, -3, -16-6(b) (2017). This means that school discipline sometimes falls under the watchful eye of the police. *See generally* Paul Holland, *Schooling* Miranda*: Policing Interrogation in the Twenty-First Century Schoolhouse*, 52 Loyola L. Rev. 39 (2006).

For students, the stakes of the disciplinary process are high. Students can be suspended and expelled, as B.A. was here. *B.A.*, 73 N.E.3d at 723. But those educational consequences are just the tip of the iceberg since school police officers' involvement can also lead to criminal charges. B.A., for example, was arrested and taken to the juvenile detention center at the end of his interview. Some students are sentenced to jail time. *See, e.g.*, *N.C. v. Commonwealth*, 396 S.W.3d 852, 854–55 (Ky. 2013). And others are

---

[2] In 2015–16, sworn law enforcement officers protected 39,900 out of 83,600 public schools. Melissa Diliberti et al., National Center for Education Statistics, *Crime, Violence, Discipline, and Safety in U.S. Public Schools* (July 2017).

[3] *See generally* D.J. Schoeff, Opinion, *Properly select, train school resource officers*, Indianapolis Star (Oct. 23, 2015), https://www.indystar.com/story/opinion/readers/2015/10/23/properly-select-train-school-resource-officers/74504540/ (maintaining that while all school resource officers have arrest powers, their primary functions are education and mentoring).

waived into adult court, where they face years-long sentences. *See, e.g.*, *Norris v. State*, 896 N.E.2d 1149, 1151 (Ind. 2008).

Ultimately, as the law-enforcement presence grows in today's schools, so does the discussion of students' rights. *See, e.g.*, Holland, *supra*, at 39. One of those rights—the right against self-incrimination—"reflects many of our fundamental values and most noble aspirations," including "our unwillingness to subject those suspected of crime to . . . self-accusation." *Carter v. Kentucky*, 450 U.S. 288, 299 (1981) (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55 (1964), *overruled in part on other grounds by United States v. Balsys*, 524 U.S. 666 (1998)). Indeed, the right, "while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'" *Id.* at 299–300 (quoting *Murphy*, 378 U.S. at 55). Because of that important role, as explained below, the right against self-incrimination is protected by *Miranda* warnings.

## B. *Miranda*'s history and application in schools.

The Supreme Court of the United States's groundbreaking *Miranda v. Arizona* decision adopted the now-famous "*Miranda* warnings." 384 U.S. 436, 444 (1966). They apply to suspects under custodial interrogation, who must be told that they have "a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed." *Id.* As the *Miranda* Court noted, "the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals," *id.* at 455, so they may be psychologically coerced into speaking, *id.* at 446–48. These warnings thus safeguard the Fifth Amendment right against self-incrimination by warding off police coercion. *Id.* at 467; *Howes v. Fields*, 565 U.S. 499, 507 (2012).

Children are particularly vulnerable to that coercion, making *Miranda* warnings especially important when police place a student under custodial interrogation at school. *J.D.B. v. North Carolina*, 564 U.S. 261, 269, 276 (2011) (citing *Miranda*, 384 U.S. at 467) ("In the specific context of police interrogation, events that 'would leave a man cold and unimpressed can overawe and overwhelm a' teen." (quoting *Haley v. Ohio*,

332 U.S. 596, 599 (1948)). In other words, students surely enjoy *Miranda* rights just as teachers, parents, janitors, cafeteria staff, or other adults at a school do. *See J.D.B.*, 564 U.S. at 276. "It would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children." *In re Gault*, 387 U.S. 1, 47 (1967). After all, students do not "shed their constitutional rights . . . at the schoolhouse gate." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655–56 (1995) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).

In *J.D.B.* the Supreme Court of the United States considered custodial interrogation in schools. 564 U.S. at 269, 276. There, a police officer pulled a thirteen-year-old seventh grader out of class, took him to a conference room, and questioned him for at least half an hour. *Id.* at 265. The Court held that a juvenile suspect's age is relevant to *Miranda*'s custody analysis, as long as it's known by the interviewing officer or would be objectively apparent to a reasonable officer. *Id.* at 277. Though the Court did not decide whether J.D.B. was under custodial interrogation, the implication is unmistakable: *Miranda* warnings protect students when they are placed under custodial interrogation at school.

Courts have understandably grappled with the custodial interrogation test in schools. For example, the Colorado Supreme Court applied *J.D.B.* and held that a seventh-grader was not entitled to *Miranda* warnings at school because he was not in custody. *People v. N.A.S.*, 329 P.3d 285, 290 (Colo. 2014). The Supreme Court of Kentucky similarly applied *J.D.B.*, finding that a student was entitled to *Miranda* warnings because he was under custodial interrogation, even in a school-discipline matter. *N.C.*, 396 S.W.3d at 862–63. And the Supreme Court of Pennsylvania held that *Miranda* warnings were required when school police officers questioned a student at school. *In re R.H.*, 791 A.2d 331, 334 (Pa. 2002). So, cases before and after *J.D.B.* reveal the challenge of determining custodial interrogation (and thus whether *Miranda* warnings are required) in schools.

These cases also show that there is no "educational purpose" exception to *Miranda* like the one our Court of Appeals applied. *B.A.*, 73 N.E.3d at 730. Instead, "confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45 (1967). Rather than using special caution, that exception

would swallow the *Miranda* rule, leaving less protection for students than for other suspects.

Also in keeping with special protections for juveniles, our legislature has crafted Indiana's juvenile waiver statute. *See* I.C. § 31-32-5-1. When *Miranda* applies to minor students, this statute does too. It allows an unemancipated juvenile to waive *Miranda* rights only through counsel or a custodial parent, guardian, custodian, or guardian ad litem. *Id.* If the statute is not followed, the State cannot use any statements as evidence. *D.M. v. State*, 949 N.E.2d 327, 333–34 (Ind. 2011).

This background leads to two points worth emphasizing. First, *Miranda*'s key exception—for public safety—will of course apply in schools in cases of imminent danger. *See New York v. Quarles*, 467 U.S. 649, 655 (1984); *Bailey v. State*, 763 N.E.2d 998, 1001–02 (Ind. 2002). So when police face the pressing need to secure the safety of students at school in light of present-day threats, *Miranda* warnings may be bypassed. *See Quarles*, 467 U.S. at 657–59. Here though, as the parties agree, B.A.'s school was in no danger at the time of his interview.

And second, none of this is to say that schools and their resource officers must avoid placing students under custodial interrogation. Students sometimes commit crimes that school resource officers will have to investigate, often by interviewing suspects. This proper role of resource officers may place students in custody. When it does, officers must give *Miranda* warnings and follow Indiana's juvenile waiver statute before asking questions. *See S.G. v. State*, 956 N.E.2d 668, 675 (Ind. Ct. App. 2011), *trans. denied*; I.C. § 31-32-5-1.

In sum, *Miranda* warnings and Indiana's juvenile waiver statute apply when minor students are placed under custodial interrogation. We now turn to the more complex discussion: the custodial interrogation test in schools.

## C. The custodial interrogation test in schools.

### 1. Custody.

The initial step in the custody analysis asks whether a reasonable person in the suspect's situation would feel free to leave. *Howes v. Fields*, 565 U.S. 499, 509 (2012). Of course, no student feels free to just walk out of the principal's office, so this step points toward custody. *See Schall v. Martin*, 467 U.S. 253, 265 (1984) ("[J]uveniles, unlike adults, are always in some form of custody."). But that does not end the analysis.

For there to be custody, the suspect's situation must also present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *Berkemer v. McCarty*, 468 U.S. 420, 437–38 (1984). In schools, the extent of those pressures shifts along a spectrum based on how much coercive power of law enforcement is brought to bear against the student. *See S.G.*, 956 N.E.2d at 676 (citing Holland, *supra*, at 41). Our Court of Appeals has already provided guidance for cases falling near the ends of this custody spectrum.

On one end of the spectrum lies traditional school discipline. *Id.* This discipline—handed down by school officials alone—does not place students in custody because police officers aren't involved. *K.F. v. State*, 961 N.E.2d 501, 512 (Ind. Ct. App. 2012), *trans. denied*. So, as in today's companion opinion *D.Z. v. State*, when school officials are not agents of the police, a clear rule applies: they can question students without providing *Miranda* warnings. *See D.Z. v. State*, No. 18S-JV-295, ___ N.E.3d ___, slip op. at 4 (Ind. June 20, 2018); *S.G.*, 956 N.E.2d at 680. And even if a police officer is present, a single officer's unintimidating presence is unlikely to create custody. *See S.G.*, 956 N.E.2d at 679.

On the other end of the spectrum lie armed and uniformed police officers who pull students from class in handcuffs before questioning them. *See id.* at 676. And "even when a private party such as a school initiates an investigation," an officer's "pervasive presence" will probably

create custody. *Id.* at 678–79. These fairly well-defined ends of the custody spectrum provide the clearest guidance.

Many cases, though, will fall in the spectrum's messy middle, posing "difficulty deciding exactly when a suspect has been taken into custody." *Berkemer*, 468 U.S. at 441. In schools, under *Miranda*'s totality-of-the-circumstances test, myriad factors may be relevant:

- The number of officers present and how they are involved. *See S.G.*, 956 N.E.2d at 679–80 (finding no custody from one officer's minimal involvement).
- Whether the setting is a traditional school-discipline environment or is police dominated. *In re Tyler F.*, 755 N.W.2d 360, 369 (Neb. 2008).
- What the student is told about the interview. *See In re C.H.*, 763 N.W.2d 708, 715 (Neb. 2009).
- The length of the interview. *N.A.S.*, 329 P.3d at 289.
- The student's age. *J.D.B.*, 564 U.S. at 277.
- Whether the student is arrested after the interview. *See Howes*, 565 U.S. at 509.
- The relationship between the parties, including whether police officers act as teachers, counselors, or law enforcement agents. *See Minnesota v. Murphy*, 465 U.S. 420, 459–60 (1984) (Marshall, J., dissenting); Holland, *supra*, at 74–75. Some schools embrace all three roles for their resource officers, while in other schools one role dominates. Holland, *supra*, at 75–77.

This list is not exhaustive given *Miranda*'s totality-of-the-circumstances test, but it offers some factors that may be relevant in the school setting.

Of course, a bright-line rule for custody would be easier for schools, police, and courts to apply in these close cases. But despite its challenges, we cannot replace *Miranda*'s custody spectrum with a simple, clear line. Such a line could not account for each case's nuances, as *Miranda*'s totality-of-the-circumstances test requires. *See Berkemer*, 468 U.S. at 441 (rejecting "a clearer, more easily administered line" as contrary to *Miranda*'s custody test); *Howes*, 565 U.S. at 505–06.

### 2. Interrogation.

Police custody alone does not trigger *Miranda*; there must be police interrogation as well. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The focus is the suspect's perceptions, not police intent. *Id.*

As with custody, when police officers aren't present, a bright-line rule applies: absent an agency relationship with police, words or actions from school officials are not interrogation. *See Ritchie v. State*, 875 N.E.2d 706, 717 (Ind. 2007); *S.G.*, 956 N.E.2d at 680–81; *G.J. v. State*, 716 N.E.2d 475, 477 (Ind. Ct. App. 1999).

But like the custody spectrum, the interrogation test may confound school administrators and resource officers when police are present. While a bright-line rule would thus be beneficial here too, the *Miranda* framework does not allow it. *See Innis*, 446 U.S. at 301–02. The "interrogation" analysis instead turns on police knowledge and actions and the suspect's perceptions. *Id.*

What does this mean for B.A.? He should have been given *Miranda* warnings if police placed him under custodial interrogation. *Miranda*, 384 U.S. at 444. We turn to that analysis, addressing first whether B.A. was in police custody and second whether he was under police interrogation.

## II. B.A. was under custodial interrogation.

### A. B.A. was in police custody.

When B.A. arrived at school that Monday morning, a uniformed Officer Tutsie escorted him from his bus straight to Vice-Principal Remaly's office. As Remaly talked with B.A., at least one officer—and often three—stayed at all times between B.A. and the door. There's no indication that any of these officers had built a relationship with B.A., or that B.A. had

any disciplinary history with them. In fact, only one officer, Officer Wheeler, typically worked at the middle school. The officers were aware, though, that B.A. was a young middle-schooler. So they knew that a reasonable person in B.A.'s shoes would be "more vulnerable or susceptible to . . . outside pressures" than would adults or older teenagers. *J.D.B.*, 564 U.S. at 272 (omission in original) (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2004)).

Despite B.A.'s youth and the severity of the situation, no one called his mom until after his interview. This left him in an unfamiliar, police-overshadowed situation without parental or other support. *See Lewis v. State*, 259 Ind. 431, 437, 440, 288 N.E.2d 138, 141, 142 (1972), *superseded by statute*, Indiana's juvenile waiver statute, P.L. 1-1997. No one told B.A. that he was free to call his mother, leave the room, take a break, or go to class. *See C.H.*, 763 N.W.2d at 715 (finding it "crucial" whether juveniles are told they are free to leave). Instead, after the interview and, finally, a brief meeting with B.A.'s mother, officers arrested B.A. to take him "downtown" to the juvenile detention center. *See Howes*, 565 U.S. at 509 (noting that whether the interviewee is released after questioning matters in the custody analysis).

As the State points out, no one yelled at or threatened B.A. Still, the consistent police presence would place considerable coercive pressure on a reasonable student in B.A.'s situation. So this case lies solidly on the "custody" end of the student-confinement spectrum. *See S.G.*, 956 N.E.2d at 676.

## B. B.A. was under police interrogation.

Officer Tutsie himself prepared a handwriting test, handed it to B.A., and explained to B.A. how to copy the sentences. As he testified, this test "was investigation material that only a police officer can probably have experience to do." And its aim was obtaining a sample to compare to the pink-marker bomb threat.

Then, Officer Lyday told B.A., "Come on, man, just—just tell the truth." In context, B.A. surely saw this for what it was: an order to fess up. This

tag-team probe, though limited, was interrogation because the officers should have known that it was "reasonably likely to elicit an incriminating response," *Innis*, 446 U.S. at 301. And it worked, finally prompting B.A.'s tearful confession and trip to juvenile detention.

## Conclusion

Since B.A. was under custodial interrogation but was not Mirandized, his statements should have been suppressed under both *Miranda* and Indiana's juvenile waiver statute. The trial court thus abused its discretion in admitting the statements. We accordingly reverse his delinquency adjudications and remand this case to the juvenile court.

David, Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
Amy E. Karozos
Greenwood, Indiana

Ruth A. Johnson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Angela N. Sanchez
Kelly A. Loy
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
CENTER ON WRONGFUL CONVICTIONS OF YOUTH

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

Laura Nirider
Northwestern Pritzker School of Law
Chicago, Illinois