857 N.E.2d 1000 (2006)
J.D.P., Appellant-Defendant,
v.
STATE of Indiana, Appellee-Plaintiff.
No. 35A04-0512-JV-728.
Court of Appeals of Indiana.
December 5, 2006.
*1002 Jeremy K. Nix, Matheny, Michael, Hahn & Denman, LLP, Huntington, IN, Attorney for Appellant.
Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

OPINION
DARDEN, Judge.

STATEMENT OF THE CASE
J.D.P., Jr. ("J.P.") appeals his adjudication as a juvenile delinquent for committing *1003 an act that would be aiding in arson as a class B felony if committed by an adult.
We affirm.

ISSUES
1. Whether the juvenile court abused its discretion by allowing a police officer to testify regarding statements made by J.P. during an interrogation in which J.P. and his mother had waived their Miranda rights.
2. Whether sufficient evidence supports J.P.'s delinquency adjudication.

FACTS
On May 21, 2005, fourteen-year-old J.P. and twelve-year-old J.W. were alone in J.P.'s backyard where they "made [Molotov] cocktails"  by putting gasoline in bottles and baby food jars and lighting them on fire  and threw them into the parking lot of the Horace Mann Apartments behind J.P.'s house. (Tr. 161) When a neighbor, Corey Gibson, yelled at the two boys and threatened to call the police, they hid behind a bush. Then the boys got up and "went back to doing what they w[ere] doing." Id. at 150. The boys were in the backyard throwing the bottles for "[a] good twenty minutes." Id.
A little later, J.P. and J.W. took some gasoline from J.P.'s shed and went to the Riverview Terrace Apartments' maintenance barn, where the apartment complex stored its lawnmower, snow blower, tools, gasoline, and hay. One of the boys then set fire to a bale of hay that was behind the barn, and the barn subsequently caught on fire. As the two boys were running away, J.P. told J.W. that he would "beat" up J.W. or "stab" him if he told on J.P. Id. at 168. The fire resulted in approximately $12,000.00 in damage to the barn and its contents.
That same day, around 7:26 p.m., an officer with the Huntington Police Department discovered the burning barn at the Riverview Terrace Apartments and requested fire units. When Officer Travis Bickel went to the Riverview Apartments as backup, the firefighters on the scene indicated that they thought the fire was an accident caused by spontaneous combustion.
Officer Bickel left Riverview Apartments, and around 7:56 p.m., was dispatched to the Horace Mann Apartments on a report that two juvenile boys had been throwing glass bottles on fire into the apartment parking lot around 7:00 p.m. When Officer Bickel arrived at the apartments, some of the residents directed him to J.P.'s house as the place where the bottle throwing had originated.
Officer Bickel went to J.P.'s house, where he found J.P., his mother, Tonya, and his twelve-year-old sister, Je.P., and asked them about the bottle-throwing activity in their backyard. They reported that they had just gotten back from Wal-Mart and that J.P. could not have been involved. Tonya told the officer that J.P. had been in her sight all day because he was on house arrest.[1] J.P. then admitted that he had been outside in the backyard to get something out of the shed for his mother. Officer Bickel and another officer on the scene went with J.P. and his mother to J.P.'s backyard to look at the shed and saw some "burn spots" in the alley, a burnt beer bottle in the neighbor's yard, and broken glass jars in the Horace Mann Apartments' parking lot. Id. at 113. Tonya then admitted that J.P. went outside but told the officers that she had kept J.P. in sight even when he was outside. J.P. then told the officers that his cousin, Daniel, *1004 caught a boy "Jonathan Brown" messing around in J.P.'s shed but that Daniel chased him away and told him to leave.[2]Id. at 117. J.P.'s sister then corrected J.P. and said that the boy's name was J.W.
Corey Gibson, the neighbor who had threatened to call the police, appeared in the alley to talk to Officer Bickel. Gibson told Officer Bickel that he saw two juvenile males throwing bottles, described what both males were wearing, and pointed to J.P., who was still standing in the backyard, as one of the boys involved. When Officer Bickel returned to J.P. and his mother in their yard and indicated that Gibson had pointed out J.P. as one of the boys involved in the bottle throwing, J.P. stated that he had been in the backyard and Tonya stated there were times that she did not see J.P. when he was in the yard and that he had been in her sight for only ninety percent of the day. Officer Bickel talked to J.P.'s probation officer about J.P.'s house arrest. Officer Bickel then arrested J.P. for false informing and violating house arrest and placed him in the juvenile detention facility.
On May 23, 2005, the State filed a petition alleging that J.P. was a delinquent child for committing an act that would be false informing as a class A misdemeanor if committed by an adult under cause number 35C01-0505-JD-48 (Cause #48). That same day, the juvenile court held an initial hearing and, pursuant to J.P.'s request for counsel, appointed counsel to represent J.P.
On June 2, 2005, Officer Bickel was able to locate and speak with J.W. and his mother about J.W.'s involvement in the bottle-throwing incident. J.W. admitted to being in J.P.'s backyard with J.P. and throwing the flaming bottles. J.W. then surprised Officer Bickel by telling him that he and J.P. started the barn fire at the Riverview Terrace Apartments. Prior to J.W.'s admission, Officer Bickel did not believe the bottle-throwing incident and the barn fire incident were related.
Based on this new information, Officer Bickel arranged a second interview with J.P. on June 4, 2005 to speak with him about the barn fire. Officer Bickel first met and talked with J.P.'s mother, Tonya, at the police station, and later, Officer Bickel and Officer Brian Double retrieved J.P. from the juvenile detention facility and took him to the police station. Officer Bickel informed J.P. and Tonya of J.P.'s Miranda rights and offered them an opportunity for "meaningful consultation[.]" Id. at 127. Tonya refused the opportunity for meaningful consultation, and J.P. and Tonya signed a Miranda warning and waiver form. Tonya remained with J.P. as Officer Bickel questioned him. Officer Bickel asked J.P. questions about the barn fire only and did not question him regarding the bottle-throwing incident or the false informing charges. During the interview, J.P. first denied having any knowledge about the barn. J.P. then stated that he saw smoke from his house and that he and his cousin Daniel rode their bikes to the apartment complex and saw the barn on fire. However, J.P. denied being at the barn when it was set on fire. After Officer Bickel told J.P. that J.W. had given a written statement indicating that J.P. was at the barn when the fire started and was actually the one who started the fire, J.P. then stated that he did go to the barn with J.W. after J.W. took gasoline out of J.P.'s shed. J.P. stated that J.W. then poured the gasoline on some hay behind the barn and set it on fire and that after J.W. lit the barn on fire, they both ran away. Officer *1005 Bickel then asked J.P. if he would make a written statement, and J.P. responded that he had an attorney and that his attorney told him not to say anything to the police. Officer Bickel ended the interview and transported J.P. back to the juvenile facility.
On June 5, 2005, Officer Bickel spoke again with J.W. and told him that J.P. implicated J.W. as the one that started the fire. Officer Bickel took J.W. to the barn, and J.W. provided the officer with additional details regarding the barn fire but continued his insistence that it was J.P. that started the fire.
On June 13, 2005, the State filed a petition alleging that J.P. was a delinquent child for committing acts that would be aiding in arson as a class B felony[3] and criminal recklessness as a class B misdemeanor[4] if committed by an adult under cause number 35C01-0506-JD-53 (Cause #53).
On June 20, 2005, J.P. filed a motion to suppress all evidence of his June 4th statement given to Officer Bickel, alleging that his statement was taken in violation of his right to counsel when the police initiated contact with him and interrogated him after he had requested appointed counsel in his false informing case, Cause #48. During the suppression hearing, the State stipulated that the police initiated contact with J.P. and that it was a custodial interrogation. Officer Bickel testified that because J.P. was a juvenile, he made sure that J.P.'s mother was present and that he offered them an opportunity for meaningful consultation. Officer Bickel also testified that during his June 4 interview with J.P. and his mother, he questioned J.P. about the barn arson only and did not question him about the bottle-throwing incident or the false informing charges. Officer Bickel further testified that before talking to J.P. regarding the arson, he contacted the prosecutor's office about interviewing J.P. a second time and "to make sure that [he] didn't violate any of [J.P.'s] rights, make sure that [he] did everything legally and in the correct way." Id. at 60. The juvenile court denied J.P.'s motion to suppress.
Thereafter, J.P. filed a notice of alibi defense, alleging that he was with his mother on May 21, 2005 from 7:20 to 7:40 p.m. On November 10, 2005, the juvenile court held a fact finding hearing on Cause #48 and Cause #53. During the hearing, J.P. objected to the admission of Officer Bickel's testimony regarding J.P.'s statements obtained during the June 4 interview based on "a violation of his 5th and 14th uh, amendment rights to have counsel present during any interrogation." Id. at 129. The juvenile court overruled J.P.'s objection and allowed Officer Bickel to testify about J.P.'s statements regarding the barn fire. During the hearing, J.W. testified that after he and J.P. threw flaming bottles from J.P.'s backyard, they then went to the Riverview Apartment storage barn, where J.P. lit some hay behind the barn on fire. J.P.'s mother and his sister testified that J.P. was with them when they went to J.C. Penney and Wal-Mart between 7:20 p.m. and 7:40 p.m. The juvenile court entered a true finding of *1006 delinquency for aiding in arson and false informing but found that J.P. was not delinquent for the criminal recklessness allegation.[5] Thereafter, the juvenile court awarded wardship of J.P. to the Indiana Department of Correction with a recommendation that he be placed at the Indiana Boys School. J.P. now appeals his aiding in arson adjudication under Cause #53.

DECISION
1. Admission of Evidence
The first issue is whether the juvenile court abused its discretion by allowing a police officer to testify regarding statements made by J.P. during an interrogation in which J.P. and his mother had waived their Miranda rights. The admission or exclusion of evidence is a matter left to the sound discretion of the trial court, and a reviewing court will reverse only upon an abuse of that discretion. B.K.C. v. State, 781 N.E.2d 1157, 1162 (Ind.Ct.App.2003). When reviewing a trial court's decision under an abuse of discretion standard, we will affirm if there is any evidence supporting the trial court's decision. Id.
J.P. argues that the trial court's admission of his statements made to Officer Bickel during the June 4 interrogation at the police station was in violation of his Fifth Amendment rights.[6] Specifically, J.P. argues that his Fifth Amendment right to counsel was violated because: (1) the invocation of his Sixth Amendment right to counsel during the May 23 initial hearing on his false informing charges was an assertion of his Fifth Amendment right to counsel during the June 4 interrogation about the barn fire; and (2) he did not voluntarily waive his Miranda rights.
We first address J.P.'s argument that his Fifth Amendment right to counsel was violated when he was interrogated on June 4 about the barn arson after he had invoked his Sixth Amendment right to counsel on May 23 during an initial hearing on the false informing charge. We disagree.
The Sixth Amendment right to counsel is "offense specific." McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The right "cannot be invoked once for all future prosecutions." Id. "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. . . ." Id. at 175-76, 111 S.Ct. 2204 (quoting Maine v. Moulton, 474 U.S. 159, 179-80, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)).
In McNeil, the defendant was arrested and charged with armed robbery, and during his initial bond hearing, a public defender was appointed to represent the defendant on the charge. Id. at 173, 111 S.Ct. 2204. While the defendant was in jail on the armed robbery charge, the police questioned him on three separate occasions about his involvement in a murder, *1007 attempted murder, and armed burglary that they were investigating. Id. at 173-174, 111 S.Ct. 2204. Each time the police met with the defendant, they advised him of his Miranda rights, and he signed a form waiving such rights. Id. The defendant admitted that he had been involved in the murder, attempted murder, and armed burglary crimes and was eventually charged with the same. Id. at 174, 111 S.Ct. 2204. The defendant's motion to suppress his statements given to police was denied, and he was convicted as charged. Id.
On appeal, the defendant argued that "although he expressly waived his Miranda right to counsel on every occasion he was interrogated, those waivers were the invalid product of impermissible approaches, because his prior invocation of the offense specific Sixth Amendment right with regard to the [armed robbery charge] was also an invocation of the non-offense-specific [Fifth Amendment] Miranda-Edwards right." Id. at 177, 111 S.Ct. 2204. The United States Supreme Court disagreed, noting that it was "false as a matter of fact and inadvisable (if even permissible) as a contrary-to-fact presumption of policy." Id.
The Supreme Court explained:
The purpose of the Sixth Amendment counsel guarantee  and hence the purpose of invoking it  is to protect the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime. The purpose of the Miranda-Edwards guarantee, on the other hand  and hence the purpose of invoking it  is to protect a quite different interest: the suspect's desire to deal with the police only through counsel. This is in one respect narrower than the interest protected by the Sixth Amendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding any suspected crime and attaches whether or not the adversarial relationship produced by a pending prosecution has yet arisen). To invoke the Sixth Amendment interest is, as a matter of fact, not to invoke the Miranda-Edwards interest. . . . [Invocation of the Miranda right to counsel] requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction. To find that the defendant invoked his Fifth Amendment right to counsel on the present charges merely by requesting the appointment of counsel at his arraignment on the unrelated charge is to disregard the ordinary meaning of that request.
Id. at 177-178, 111 S.Ct. 2204 (internal quotation marks, citations, and brackets omitted). Thus, the Supreme Court held that the assertion of the Miranda right to counsel cannot be inferred from the invocation of the Sixth Amendment right to counsel on different charges.
Similarly, we conclude that J.P.'s Fifth Amendment right to counsel was not violated when he was interrogated on June 4 about the barn arson after he had invoked his Sixth Amendment right to counsel on May 23 during an initial hearing on the false informing charge. Here, J.P. was alleged to be a delinquent under Cause #48 for having committed false informing based on false information he gave while Officer Bickel was questioning him about the bottle-throwing incident in J.P.'s backyard. On May 23, 2005, the juvenile court held an initial hearing on the false informing charge and, pursuant to J.P.'s request *1008 for counsel, appointed counsel. On June 2, 2005, while Officer Bickel questioned J.W. about his involvement in throwing flaming bottles from J.P.'s backyard, he learned for the first time that J.W. and J.P. had set fire to the barn at the Riverview Terrace Apartments. Thus, on June 4, 2005, Officer Bickel arranged to have J.P. and his mother go to the police station so that he could question J.P. about the barn arson. During the suppression hearing and dispositional hearing, Officer Bickel testified that his questioning during the June 4 interview was limited solely to a discussion of the barn fire. Subsequently, on June 13, 2005, the State filed a petition alleging that J.P. was a delinquent child for committing acts that would be aiding in arson under cause number Cause #53.
Thus, when J.P. was questioned about the barn fire, he had not been charged with aiding in arson and, indeed, could not have even asserted a Sixth Amendment right to counsel for that offense. See McNeil, 501 U.S. at 175, 111 S.Ct. 2204 (holding that the Sixth Amendment right to counsel does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings). Although J.P. had asserted a Sixth Amendment right to counsel on his charged offense of false informing, it could not be invoked for his future prosecution on the uncharged aiding in arson offense.
The record reveals that J.P.'s act of false informing (which occurred when the police were investigating the bottle-throwing incident in J.P.'s backyard) and J.P.'s act of aiding in arson at the Riverview Terrace Apartments took place on the same day; nevertheless, they are unrelated in that they are different charges and occurred at different locations. Thus, J.P.'s invocation of his Sixth Amendment right to counsel during the May 23 initial hearing on his false informing charges was not an assertion of his Fifth Amendment right to counsel during the June 4 interrogation about the unrelated, uncharged offense of aiding in the arson of the barn.[7]
We next address J.P.'s argument that he did not voluntarily waive his Miranda rights. Indiana Code Section 31-32-5-1 sets forth the requirements for a valid waiver of state or federal constitutional rights in cases involving a juvenile and provides:
Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
(1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;
(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
(A) that person knowingly and voluntarily waives the right;
(B) that person has no interest adverse to the child;

*1009 (C) meaningful consultation has occurred between that person and the child; and
(D) the child knowingly and voluntarily joins with the waiver; or
(3) by the child, without the presence of a custodial parent, guardian, or guardian ad litem, if:
(A) the child knowingly and voluntarily consents to the waiver; and
(B) the child has been emancipated under IC XX-XX-XX-X or IC XX-XX-XX-XX, by virtue of having married, or in accordance with the laws of another state or jurisdiction.
The "meaningful consultation" requirement will be met when the State demonstrates "actual consultation of a meaningful nature or the express opportunity for such consultation, which is then forsaken in the presence of the proper authority by the juvenile, so long as the juvenile knowingly and voluntarily waives his constitutional rights." Brown v. State, 751 N.E.2d 664, 670 (Ind.2001) (quoting Williams v. State, 433 N.E.2d 769, 772 (Ind.1982)).
The State bears the burden of showing that a juvenile defendant received all of the protections of the foregoing statute. Id. However, as with any review of the admissibility of a confession, we review the evidence in the light most favorable to the trial court's decision. Id. We review a trial court's ruling as to the voluntariness of a waiver by looking to the totality of the circumstances. Cherrone v. State, 726 N.E.2d 251, 253 (Ind.2000). Pursuant to Indiana Code section 31-32-5-4, a review of the totality of the circumstances in a juvenile case includes consideration of the child's physical, mental and emotional maturity; whether the child or parent understood the consequences of the child's statements; whether the child and parent had been informed of the delinquent act; the length of time the child was held in custody before consulting with his parent; whether there was any coercion, force, or inducement; and whether the child and parent were advised of the child's right to remain silent and to the appointment of counsel. Id. at 253-54.
J.P. does not challenge the "meaningful consultation" requirement and, instead, argues that "the totality of the circumstances indicate that the Juvenile's written waiver was not voluntary." (Appellant's Br. 12). Again, we disagree.
The record reveals that J.P. was fourteen years old when he made his statements and had a juvenile record  including prior adjudications for theft and conversion and pending delinquency petitions for theft and resisting law enforcement  which shows that he has interacted with the justice system on prior occasions. Officer Bickel first met and talked with J.P.'s mother at the police station, and later, Officer Bickel and Officer Brian Double retrieved J.P. from the juvenile detention facility and took him to the police station. J.P. had been held in the juvenile detention facility for about two weeks on the false informing charge and violation of his house arrest. Once at the police station, Officer Bickel informed J.P. and his mother of J.P.'s Miranda rights and offered them the opportunity for consultation, and each of them signed the Miranda waiver form. J.P.'s mother remained with him during the interview. During the suppression hearing, J.P.'s mother testified that she did not believe that J.P. had done "anything wrong with that barn fire" and told the officers that she thought it was a good idea if the truth came out during the interview. (Tr. 67). When J.P. admitted that he was present at the scene when the barn was set fire, J.P.'s mother started crying. Aside from J.P.'s testimony during the suppression hearing that he "felt that [he] had to" answer Officer Bickel's questions, the record does not contain any *1010 evidence of police force, coercion or improper inducement to secure J.P.'s statement. Id. at 72. Under the totality of the circumstances, J.P.'s statement was voluntary and was properly admitted into evidence. See, e.g., Borton v. State, 759 N.E.2d 641, 647 (Ind.Ct.App.2001) (holding that the juveniles statements to police were properly admitted into evidence where the totality of the circumstances showed that the juvenile's statements were voluntary), trans. denied.
2. Sufficiency of Evidence
The last issue is whether sufficient evidence supports J.P.'s delinquency adjudication for aiding in arson. When we review sufficiency of the evidence claims with respect to juvenile adjudications, we neither reweigh the evidence nor judge the credibility of the witnesses. B.K.C., 781 N.E.2d at 1163. Rather, we consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. Id. The uncorroborated testimony of one witness may be sufficient by itself to sustain an adjudication of delinquency on appeal. R.L.H. v. State, 738 N.E.2d 312, 315 (Ind.Ct.App.2000).
In order to sustain an adjudication for aiding in arson as a class B felony, the State had to prove beyond a reasonable doubt that J.P. knowingly or intentionally aided, induced, or caused another person, by means of fire, explosive, or destructive device, to damage property of another person without the other person's consent and the pecuniary loss was at least five thousand dollars ($5,000). See Ind.Code §§ 35-43-1-1(a)(3); XX-XX-X-X.
Here, J.W. testified unequivocally that he and J.P. took some gasoline from J.P.'s shed and went to the Riverview Terrace Apartments' maintenance barn, where J.P. then set fire to a bale of hay that was behind the barn, and the barn subsequently caught on fire. As the two boys were running away, J.P. told J.W. that he would beat or stab J.W. if he told on J.P. In addition, in his statement to Officer Bickel, J.P. admitted to being at the scene of the barn fire. The manager of the apartment complex testified that the fire resulted in approximately $12,000.00 in damage to the barn and its contents.
J.P. argues that "the only evidence supporting the [juvenile] court's decision [to find that J.P. was a delinquent for aiding in arson] was the testimony of [J.W.] and the statements made by [J.P.] in violation of his constitutional rights." (Appellant's Br. 16). J.P. further contends that J.W.'s testimony was inconsistent and, instead, highlights the evidence that he presented to support his notice of alibi defense.
First, as noted above, J.P.'s statement to Officer Bickel was properly admitted. In addition, J.P.'s arguments are nothing more than a request to reweigh the evidence and judge the credibility of the witnesses, which we cannot do. The evidence presented at the dispositional hearing is sufficient to sustain the trial court's adjudication of J.P. as a delinquent for committing aiding in arson as a class B felony if committed by an adult.
Affirmed.
NAJAM, J., and FRIEDLANDER, J., concur.
NOTES
[1] The record reveals that J.P. was on house arrest for pending charges of theft, resisting law enforcement, and minor in possession of alcohol that he was alleged to have committed while he was on probation from a separate theft disposition.
[2] Officer Bickel later tried to obtain identifying information about cousin Daniel from Tonya so that he could interview Daniel, but Tonya never provided Officer Bickel the information.
[3] The delinquency petition for aiding in arson alleged that J.P. "recklessly, knowingly or intentionally performed an act that created a substantial risk of bodily injury to [J.W.], to-wit: threw glass containers filled with gasoline that were lit on fire." (App.7).
[4] The delinquency petition for criminal recklessness alleged that J.P. "knowingly or intentionally aid another person in damaging the property of another person by means of fire, explosive, or destructive device, without the other person's consent, to-wit: did damage a barn situated at 729 Frederick Street belonging to Riverview Terrace Apartments, when the pecuniary loss was at least Five Thousand dollars ($5,000)." (App.7).
[5] The juvenile court stated, "I think the aiding and the uh, arson will take care of that [criminal recklessness]." (Tr. 249).
[6] J.P. also appears to argue that the admission into evidence of his statements made to Officer Bickel during the June 4 interrogation was in violation of his Sixth Amendment right to counsel. To the extent that he is indeed raising a Sixth Amendment argument, he has waived it because he did not object to the admission of his statement based on the Sixth Amendment. See Gill v. State, 730 N.E.2d 709, 711 (Ind.2000) ("It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal.").
[7] In addition, we note that J.P.'s reliance on Currie v. State, 512 N.E.2d 882 (Ind.Ct.App. 1987), reh'g denied, trans. denied, to support his argument  that the invocation of his Sixth Amendment right to counsel during the May 23 initial hearing on his false informing charges was an assertion of his Fifth Amendment right to counsel during the June 4 interrogation about the barn fire  is not persuasive. In Currie, the defendant had invoked his Sixth Amendment right to counsel during an initial hearing on a burglary charge and that same day was interrogated by police on the same burglary charge. The Indiana Supreme Court held that the defendant's "request for counsel reflect[ed] a decision to consult with an attorney and deal with the authorities through that attorney." Currie, 512 N.E.2d at 883. Unlike Currie, on June 4th, J.P. was not being questioned on the same charge for which he had asserted his request for counsel.