

FILED

Aug 19 2019, 10:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Michael A. Campbell
Highland, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant/Cross-Appellee-Petitioner,*

v.

O.E.W.,

*Appellee/Cross-Appellant-Respondent.*

August 19, 2019

Court of Appeals Case No.
18A-JV-2409

Interlocutory Appeal from the
Lake Superior Court, Juvenile
Division

The Honorable Thomas P.
Stefaniak, Jr., Judge

The Honorable Matthew B.
Gruett, Magistrate

Trial Court Cause Nos.
45D06-1803-JD-106

**Mathias, Judge.**

[1] The State of Indiana appeals the order of the Juvenile Division of the Lake Superior Court granting a motion filed by juvenile O.E.W. seeking to suppress statements he made during a police interview in which he was not advised of his *Miranda* rights. O.E.W. cross-appeals and argues that the juvenile court clearly erred by finding that there was probable cause to believe that he committed acts that would be, if committed by an adult, felony murder, Level 2 felony robbery resulting in serious bodily injury, and Class A misdemeanor theft. We affirm the juvenile court in all respects.

## Facts and Procedural History

[2] In August 2017, then-fifteen-year-old O.E.W. lived with his de facto father Andy Ruiz ("Ruiz"), Ruiz's children, and Ruiz's girlfriend Adriana Garcia ("Garcia"), in a home on Alexander Avenue in Hammond, Indiana. O.E.W.'s girlfriend, C.P., lived on the same block. The victim in this case, Lucia Gonzales ("Gonzales"), lived a block away on Alexander Avenue with her children and her boyfriend, Marco Vera ("Vera"). O.E.W. had previously purchased marijuana from Vera and, on at least one occasion, directly from Gonzales herself.

[3] On August 21, 2017, O.E.W. told his girlfriend C.P. that he planned to go to purchase marijuana from Vera at 9:00 p.m. that night. Between 8:45 p.m. and 9:00 p.m. that evening, Ruiz noticed that O.E.W. had left home without permission. Garcia sent her son and C.P. out to look for O.E.W. Shortly thereafter, C.P. saw O.E.W. running away from the area near Gonzales's home toward the dead-end of Alexander Avenue. O.E.W. then returned to the area of

Gonzales's home, got on his bicycle, and rode away. Although C.P. called out O.E.W.'s name, he did not stop.

[4] O.E.W. returned home at approximately 9:30 p.m. He immediately went into the bathroom and took a shower. When O.E.W. came out of the shower, Ruiz noticed that O.E.W. had several injuries, including puncture wounds to his arms, legs, back, and torso. When confronted by Ruiz, O.E.W. initially stated that the chain on his bicycle had broken and that he had injured himself while attempting to fix it. When Ruiz stated that the injuries did not appear to have been caused by fixing the bicycle, O.E.W. then claimed that he had been stabbed during a fight at a local park. Ruiz took O.E.W. to the hospital, where his wounds were treated. Early the next morning, Garcia saw a black Samsung smartphone lying near O.E.W.'s phone. Garcia had never seen the Samsung phone before, and, when she returned from work later that day, the phone was gone.

[5] Also early the next morning, at approximately 6:00 a.m., Gonzales's six-year-old daughter came to her neighbor's home, carrying her younger siblings. The small child told the neighbor that she saw someone whom she thought to be her "stepfather" Vera lying on the floor, bleeding. Tr. Vol. 2, p. 171. The neighbor telephoned the police, who went to the Vera/Gonzales home and found the body of Gonzales, not Vera, lying supine on the kitchen floor. Gonzales's body was covered in blood; her pants had been pulled down, exposing her genitalia, and her shirt had been pulled up, exposing her breasts. Gonzales had defensive wounds on her arms and had suffered numerous stab wounds and cuts to her

head and upper torso. She had also suffered a blunt-force wound to the head that caused an open skull fracture and resulting brain injury. The police were unable to locate Gonzales's Samsung smartphone.

[6] Later that day, O.E.W.'s mother, S.W., reported the alleged attack on her son to the police. After speaking with a patrol officer, she telephoned a Detective Suarez, who informed her that she should bring her son to the station to make a statement. She accordingly took O.E.W. to the police station that evening to speak with detectives about his claim that he had been stabbed by another juvenile in a local park the night before. She also indicated to the police that she was concerned that the attack on her son might somehow be related to the death of Gonzalez.

[7] Hammond Police Department Detective Shawn Ford ("Detective Ford") spoke with O.E.W. and his mother in an interview room, where O.E.W.'s statement was video recorded.[1] O.E.W. sat at one side of an oval table with Detective Ford sitting across from him. O.E.W.'s mother sat slightly behind and to the right of O.E.W. near the corner of the interview room. O.E.W. told Detective Ford that he and his friend M.C. went to a local park to meet I.W. and his friend D.M. so that O.E.W. and I.W. could finish a fight that had started at

---

[1] Although the video was recorded, it was not offered into evidence at the suppression hearing. It is therefore not part of the record on appeal. O.E.W.'s counsel offered to provide the juvenile court a copy of the video at the end of the suppression hearing, but the court indicated that it did not believe it was necessary to view the video to rule on the suppression issue. The juvenile court thus ruled on the suppression issue without ever having viewed the interview and based its ruling solely on the testimony of O.E.W.'s mother and the two testifying officers.

school. O.E.W. stated that, after he won the fight, I.W. stabbed him. At some point in the interview, Detective Ford's supervisor, Lieutenant Mark Tharp ("Lt. Tharp") came into the interview room. He did not sit down, but leaned against the door frame. Lt. Tharp also worked as a resource officer at the high school O.E.W. attended and knew some of the juveniles involved in the fight.

[8] During the interview, O.E.W.'s mother appeared to be "uncomfortable and just very kind of nervous and unsettled[.]" Tr. Vol. 2, p. 33. Detective Ford wondered why O.E.W.'s mother was concerned that her son, or the attack on her son, might be connected with the death of Gonzales. Detective Ford therefore asked if he could speak to her privately, and she agreed. Lt. Tharp took O.E.W. into another room while Detective Ford spoke with O.E.W.'s mother. Lt. Tharp made small talk with O.E.W., but did not interview him and did not garner any information from him at this time. Detective Ford asked O.E.W.'s mother if she had any problems with him asking her son about the murder, and she indicated that "she's fine with [that]." *Id.*

[9] Detective Ford was not involved with the investigation of Gonzales's death and therefore did not know any of the details of the homicide itself. He therefore asked O.E.W. open-ended questions regarding the murder. O.E.W. indicated that he knew Gonzales and was aware that she had been killed. Detective Ford had already established where O.E.W. claimed to be at the time of the murder—in the park fighting. Lt. Tharp testified that he recalled how O.E.W. stated that he had previously been to the home of Vera and Gonzales. *Id.* at 50–

51. At some point during the interview,[2] evidence technicians took photographs of O.E.W.'s injuries and took a buccal swab to collect his DNA. At the conclusion of the interview, O.E.W. and his mother left the police station.

[10] Detective Ford subsequently spoke with I.W., the youth whom O.E.W. claimed to have fought on the night of the murder. I.W. admitted that he and O.E.W. had gotten into a fight at school, but stated that he did not go to the park to fight. I.W.'s father confirmed that his son was at home that night. I.W. also had no injuries that indicated he had been in a fight. I.W.'s friend D.M. also denied having been at the park, and he too had no injuries indicating that he had been in a fight. O.E.W.'s friend, M.C., also denied having been with O.E.W. in the park when he claimed to have been stabbed. Instead, M.C. told the police that O.E.W. had told him that he was stabbed by someone he could not identify.

[11] On August 23, 2017, the police secured a warrant for information regarding the location of Gonzales's phone. The phone's service provider gave the police the location of the phone, which was on the 1700 block of 171st Street in Hammond. The police went to that address and found O.E.W. sleeping in the basement. Beneath his pillow was Gonzales's phone. Forensic investigation of

---

[2] During the suppression portion of the hearing, it was not established when the photographs and buccal swab were taken. During the remainder of the waiver hearing, however, Detective Ford testified that that this occurred "pretty early on" in the interview, apparently before he spoke with O.E.W.'s mother and began to ask O.E.W. questions concerning the Gonzales murder. *Id.* at 198. Even if it was improper to take a DNA sample of O.E.W. at this time, the lead detective in the murder investigation later secured a warrant to take a DNA sample from O.E.W.

the phone revealed that it had last connected to Gonzales's wi-fi network at approximately 9:00 p.m. on August 21, the night of the murder, and had next connected to a secure wi-fi network at O.E.W.'s home the following morning at 7:20 a.m. Later that day, it connected to another wi-fi network named "[O.E.W.]'s iPhone." Tr. Vol. 3, pp. 31, 37.

[12]    The lead detective in the murder case now considered O.E.W. to be a suspect. Accordingly, he secured a warrant to gather a DNA sample from O.E.W., and the police again took a buccal swab from O.E.W. Subsequent testing revealed that DNA from O.E.W. or one of his paternal relatives was located on the shirt Gonzales was wearing at the time of her death. Gonzalez's DNA was also found on O.E.W.'s underwear, but the rest of the clothes he had been wearing had already been laundered.

[13]    After speaking with O.E.W.'s girlfriend C.P., the police searched the area near the dead-end of Alexander Avenue, where she had seen O.E.W. run after leaving the area of Gonzales's home. There, they discovered a crow bar and a kitchen knife. Gonzales's injuries were consistent with being inflicted by these items, and her boyfriend Vera indicated that the recovered items looked similar to those kept in their home and garage. The knife and crowbar had been left exposed to the elements, including a heavy rainstorm the night of the murder. Thus, the police were unable to obtain any blood samples or usable DNA from these items.

On March 26, 2018, the State filed a request seeking authorization to file a petition alleging O.E.W. was a delinquent child, which request the juvenile court granted. The following day, the State filed a petition alleging that O.E.W. was a delinquent child for committing acts that, if committed by an adult, would be knowing or intentional murder, felony murder, Level 2 felony robbery resulting in serious bodily injury, and Class A misdemeanor theft. The State simultaneously filed a petition to waive jurisdiction of the case to adult criminal court.

On July 23, 2018, the juvenile court held the first of several hearings on the waiver issue. At the beginning of the hearing, O.E.W. moved to suppress the statements he made during his interview with the police, claiming that he had been subjected to custodial interrogation without having been advised of his *Miranda* rights. The juvenile court therefore heard the issue of the motion to suppress before continuing with the waiver issue. After listening to testimony from O.E.W.'s mother, Detective Ford, and Lt. Tharp, and hearing the arguments of counsel, the juvenile court granted the motion in part, suppressing any statements made by O.E.W. in the second part of the interview where Detective Ford asked questions about Gonzales's death. The juvenile court then proceeded to hear evidence on the issue of the motion to waive the case to criminal court.

On August 22, 2018, the State filed a motion to certify the juvenile court's order on the motion to suppress for interlocutory appeal. On August 27, 2018, before the court had ruled on the State's motion to certify the suppression order for

interlocutory appeal, the juvenile court entered an order finding sufficient probable cause to believe that O.E.W. committed what would be, if committed by an adult, felony murder, robbery resulting in serious bodily injury, and theft.[3] The juvenile court, however found that there was "insufficient probable cause to believe [O.E.W.] committed the delinquent act of Murder, Felony (I.C. 35-42-1-1(1) [knowing or intentional murder])." Appellant's App. p. 95. The State then filed, and the juvenile court granted, a motion to dismiss that allegation.[4]

[17] On August 31, 2018, the juvenile court issued an order waiving jurisdiction to adult criminal court. On September 10, 2018, the juvenile court granted the State' motion to certify its suppression order for interlocutory appeal. The following day, O.E.W. filed a motion to certify the juvenile court's probable cause order for interlocutory appeal, which the court granted on September 18, 2018. This court subsequently granted the parties' motions to accept interlocutory jurisdiction and, on January 31, 2019, we granted the State's motion to consolidate the two interlocutory appeals.

---

[3] As discussed below, a finding of probable cause is required before jurisdiction of a juvenile delinquency case may be waived to adult court.

[4] The juvenile court also issued waiver orders in two other cases involving O.E.W.: Cause No. 45D06-1708-JD-500 and Cause No. 45D06-1708-JD-501, alleging that O.E.W. committed acts that would be rape and robbery. The notices of appeal filed by both the State and O.E.W. in the instant appeal reference only the juvenile court's orders in Cause No. 45D06-1803-JD-106, and neither party presents any argument with regard to the juvenile court's orders in these other two causes. Our discussion is therefore limited to Cause No. JD-106, involving the murder of Gonzales.

## I. The State's Appeal

[18] We first address the issue presented in the State's interlocutory appeal, i.e., whether the juvenile court erred by granting O.E.W.'s motion to suppress the statements he made during the interview with Detective Ford and Lt. Tharp.

### A. Standard of Review

[19] Questions regarding the admission of evidence are generally entrusted to the discretion of the juvenile court, and we review the court's rulings only for an abuse of that discretion. *J.D.P. v. State*, 857 N.E.2d 1000, 1006 (Ind. Ct. App. 2006) (citing *B.K.C. v. State*, 781 N.E.2d 1157, 1162 (Ind. Ct. App. 2003)), *trans. denied*. Here, however, the State "b[ore] the burden of demonstrating the constitutionality of the measures it uses in securing information." *State v. Mason*, 829 N.E.2d 1010, 1015 (Ind. Ct. App. 2005) (citing *State v. Farber*, 677 N.E.2d 1111, 1113 (Ind. Ct. App. 1997), *trans. denied*). Thus, because the juvenile court granted the motion to suppress, the State appeals from a negative judgment. *See id.* (citing *Farber*, 677 N.E.2d at 1113–14). A party appealing a negative judgment must show that the lower court's ruling was contrary to law. *Id.* We will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that of the lower court. *Id.* (citing *Farber*, 677 N.E.2d at 1114). And we neither reweigh the evidence nor judge the credibility of witnesses and consider only the evidence most favorable to the judgment. *Id.*

## B. Miranda Warnings

As our supreme court recently summarized:

> The Supreme Court of the United States's groundbreaking *Miranda v. Arizona* decision adopted the now-famous "*Miranda* warnings." 384 U.S. 436, 444 (1966). They apply to suspects under custodial interrogation, who must be told that they have "a right to remain silent, that any statement [they do] make may be used as evidence against [them], and that [they have] a right to the presence of an attorney, either retained or appointed." *Id*. As the *Miranda* Court noted, "the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals," *id*. at 455, so they may be psychologically coerced into speaking, *id*. at 446–48. These warnings thus safeguard the Fifth Amendment right against self-incrimination by warding off police coercion. *Id*. at 467; *Howes v. Fields*, 565 U.S. 499, 507 (2012).

*B.A. v. State*, 100 N.E.3d 225, 230 (Ind. 2018). Children are particularly vulnerable to such coercion, making *Miranda* warnings especially important, even when police place a student under custodial interrogation at school as opposed to a police station. *Id.* (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011)).

## C. Juvenile Waiver Statute

In this state, juveniles have long been accorded special status in the area of criminal procedure. *S.D. v. State*, 937 N.E.2d 425, 429–30 (Ind. Ct. App. 2010) (citing *Hall v. State*, 264 Ind. 448, 451, 346 N.E.2d 584, 586 (1976)), *trans. denied*. "To give effect to that status in the context of waiving intricate, important, and long established Fifth and Sixth Amendment rights, we require

that a juvenile be afforded a meaningful opportunity to consult with a parent or guardian before the solicitation of any statement." *Id.* at 429. Accordingly, our General Assembly enacted the juvenile waiver statute.[5] *B.A.*, 100 N.E.3d at 231.

[22]  The juvenile waiver statute provides:

> Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
>
> (1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;
>
> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
>
> > (A) that person knowingly and voluntarily waives the right;
> >
> > (B) that person has no interest adverse to the child;
> >
> > (C) meaningful consultation has occurred between that person and the child; and
> >
> > (D) the child knowingly and voluntarily joins with the waiver; or
>
> (3) by the child, without the presence of a custodial parent, guardian, or guardian ad litem, if:

---

[5] These protections were first set forth by our supreme court in *Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138 (1972), and were later codified in the juvenile waiver statute. *See Sevion v. State*, 620 N.E.2d 736, 738 (Ind. Ct. App. 1993) (citing predecessor statute).

> (A) the child knowingly and voluntarily consents to the waiver; and
>
> (B) the child has been emancipated under IC 31-34-20-6 or IC 31-37-19-27, by virtue of having married, or in accordance with the laws of another state or jurisdiction.

Ind. Code § 31-32-5-1. When *Miranda* applies to minors, the juvenile waiver statute applies too. *B.A.*, 100 N.E.3d at 231.

[23] Importantly, however, *Miranda* is applicable only when an individual is subject to custodial interrogation. Accordingly, when a juvenile who is not in custody gives a statement to police, neither the safeguards of *Miranda* warnings nor the juvenile waiver statute is implicated. *S.D.*, 937 N.E.2d at 430 (citing *Borton v. State*, 759 N.E.2d 641, 646 (Ind. Ct. App. 2001), *trans. denied*). Thus, the threshold issue is whether O.E.W. was in custody at the time he spoke with the police. *See id.* If so, the police were required to comply with *Miranda* and the juvenile waiver statute.

[24] The question of whether a person is in custody for purposes of *Miranda* is a mixed question of fact and law. *State v. Ruiz*, 123 N.E.3d 675, 679 (Ind. 2019). The circumstances surrounding the interrogation are questions of fact, and whether those facts add up to custody for *Miranda* purposes is a question of law. *Id.* As always, "we defer to the [juvenile] court's factual findings . . . [b]ut we review de novo the legal question of whether the facts amounted to custody." *Id.* (citing *State v. Brown*, 70 N.E.3d 331, 334–35 (Ind. 2017); *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006)).

[25] In determining whether a person was in custody such that *Miranda* warnings are required, our ultimate inquiry is whether there is a formal arrest or a restraint of the freedom of movement of the degree associated with a formal arrest. *Hicks v. State*, 5 N.E.3d 424, 429 (Ind. Ct. App. 2014) (citing *State v. Hicks*, 882 N.E.2d 238, 241 (Ind. Ct. App. 2008)), *trans. denied*.[6] We make this determination by examining whether a reasonable person in similar circumstances would believe he or she is not free to leave. *Id*. We examine all the circumstances surrounding an interrogation, and we are concerned with objective circumstances, "not upon the subjective views of the interrogating officers or the suspect." *Id*. (citing *Hicks*, 882 N.E.2d at 241).

[26] Our court has previously referenced a "helpful list of factors commonly considered by courts in determining whether a person was in custody for purposes of *Miranda*" that was compiled by the Seventh Circuit Court of Appeals. *See Bean v. State*, 973 N.E.2d 35, 40 (Ind. Ct. App. 2012) (citing *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996)), *trans. denied*. These factors include:

> whether and to what extent the person has been made aware that he is free to refrain from answering questions; whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination; the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed; and whether the suspect could

---

[6] The court in *State v. Hicks*, in turn cited *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene.

*Id.*; *accord Reid v. State*, 113 N.E.3d 290, 300 (Ind. Ct. App. 2018), *trans. denied*; *Gauvin v. State,* 878 N.E.2d 515, 521 (Ind. Ct. App. 2007), *trans. denied*; *see also Ruiz*, 123 N.E.3d at 680 (listing factors including "location, duration, and character of the questioning; statements made during the questioning; the number of law-enforcement officers present; the extent of police control over the environment; the degree of physical restraint; and how the interview begins and ends[.]").

[27] The historical facts surrounding O.E.W.'s interview with the police are relatively undisputed. O.E.W.'s mother made the initial contact with the police about her son being stabbed, as she was concerned that her son's stabbing might be related to the attack on Gonzales. The police told her to bring him to the station to make a statement. Thus, although she came to the station voluntarily, she did so at the request of the police. Detective Ford interviewed O.E.W. at the police station in a small interview room, and there were two officers present during the questioning. After asking questions unrelated to Gonzales's death, Detective Ford took O.E.W.'s mother aside to ask if he could speak with her son about the murder. Although she agreed, O.E.W.'s mother testified that she was nervous and scared. She also testified that she did not feel free to leave.[7]

---

[7] Although her subjective belief is not dispositive, *see Hicks*, 5 N.E.3d at 429, we still find it relevant to the question of whether a reasonable person would feel free to leave.

Moreover, although neither O.E.W. nor his mother was physically restrained, and the door to the interview room remained open, they were never informed that they were free to leave.

[28] In terms of the *Sprosty* factors, O.E.W. was not informed that he was free to refrain from answering questions. It is not entirely clear how long the interrogation lasted, but the questions do not appear to have been terribly accusatory. Still, the police did question O.E.W. about his knowledge of the murder. The police had exclusive control over the environment where the questioning took place. Indeed, we can think of few environments where an otherwise-unrestrained juvenile would feel *less* free to leave than an interview room in a police station. Although O.E.W. was not physically restrained, he was not informed that he was free to leave. *See State v. Linck*, 708 N.E.2d 60, 63 (Ind. Ct. App. 1999), *trans. denied*. We also note that O.E.W. was always in the presence of at least one of the officers. Furthermore, there is no indication that O.E.W. was ever given an opportunity to consult with his mother about answering the questions. Given the totality of these circumstances, we agree with the juvenile court that O.E.W. was in custody. That is, a reasonable juvenile in his position, having been brought to the police station by his mother, subjected to interrogation regarding a murder in an interview room, and never being told that he was free to leave, would not feel free to leave.

[29] Because he was in custody for purposes of *Miranda*, the police should have advised O.E.W. of his *Miranda* rights and complied with the mandates of the juvenile waiver statute. It is uncontested that they did neither. We therefore

conclude that the juvenile court did not err as a matter of law by granting O.E.W.'s motion to suppress.[8]

## II. O.E.W.'s Cross-Appeal

[30] On cross-appeal, O.E.W. contends that the juvenile court clearly erred by finding that probable cause existed to believe that O.E.W. committed the acts that, if committed by an adult, would be felony murder, robbery causing serious bodily injury, and theft.

### A. Probable Cause Requirement for Waiver

[31] Probable cause that a juvenile committed the acts alleged is required before the juvenile court may waive jurisdiction to criminal court.[9] A juvenile court shall waive jurisdiction of a juvenile to adult criminal court if it finds, after a hearing that: (1) the child is charged with an act which would be murder if committed by an adult; (2) there is probable cause to believe that the child has committed the murder; (3) and the child was at least twelve years of age when the act

---

[8] The juvenile court granted the motion to suppress only with regard to the latter part of the interview. O.E.W. makes no claim that the juvenile court erred by not granting the motion to suppress with regard to the initial part of the interview, likely because it is undisputed that O.E.W. made no incriminating statements during this portion of the interview. We therefore express no opinion on the propriety of the juvenile court's ruling with regard to the initial part of the interview. Still, we emphasize the importance of compliance with the juvenile waiver statute when interviewing juvenile suspects, as children are particularly vulnerable to such coercion, making *Miranda* warnings especially important. *B.A.*, 100 N.E.3d at 230 (citing *J.D.B.*, 564 U.S. at 269).

[9] Even before a delinquency petition may be filed, the juvenile court must first determine whether there is probable cause to believe that: "(A) the child is a delinquent child," and "(B) it is in the best interests of the child or the public that the petition be filed." Ind. Code § 31-37-10-2. Here, O.E.W.'s attack on the sufficiency of the evidence supporting the juvenile court's probable cause order is aimed not at this preliminary probable cause determination, but the subsequent probable cause determination required to waive a juvenile to adult criminal court.

charged was allegedly committed. Ind. Code § 31-30-3-4. The only restriction upon waiver is if the juvenile court determines that it "would be in the best interests of the child and of the safety and welfare of the community for the child to remain within the juvenile justice system." *Id.*

[32] Indiana Code section 31-30-3-2 similarly states that upon motion of the prosecutor and following a hearing, the juvenile court may waive jurisdiction if it finds that:

> (1) the child is charged with an act that is a felony:
>
>> (A) that is heinous or aggravated, with greater weight given to acts against the person than to acts against property; or
>>
>> (B) that is a part of a repetitive pattern of delinquent acts, even though less serious;
>
> (2) the child was at least fourteen (14) years of age when the act charged was allegedly committed;
>
> (3) there is probable cause to believe that the child committed the act;
>
> (4) the child is beyond rehabilitation under the juvenile justice system; and
>
> (5) it is in the best interests of the safety and welfare of the community that the child stand trial as an adult.

[33] Thus, under either of these statutes, a finding of probable cause that the child committed the act or acts alleged is required before a juvenile may be waived to adult court. O.E.W. argues that there was insufficient evidence to support a

finding of probable cause that he committed the acts alleged, i.e., felony murder, robbery resulting in serious bodily injury, and theft.

[34] Probable cause exists when the facts and circumstances, based upon reasonably trustworthy information, are sufficient to warrant a reasonable belief that a crime has been committed. *Strosnider v. State*, 422 N.E.2d 1325, 1328 (Ind. Ct. App. 1981). This standard requires more than a mere suspicion, but does not require proof beyond a reasonable doubt. *Id.*

[35] A juvenile court's waiver order must include specific findings of fact to support the order. *Jordan v. State*, 62 N.E.3d 401, 405 (Ind. Ct. App. 2016) (citing Ind. Code § 31-30-3-10), *trans. denied*. We therefore apply our familiar two-tiered standard of review for review of a trial court's findings of fact and conclusions of law. *See* Trial Rule 52(A) (noting that trial court shall make special findings of fact without request by the parties "in any other case provided by these rules or by statute."). Under this standard, we consider first whether the evidence supports the findings, and second, whether the findings support the judgment. *In re D.S.*, 910 N.E.2d 837, 840 (Ind. Ct. App. 2009) (citing *In re T.S.*, 906 N.E.2d 801, 804 (Ind. 2009)), *trans. denied*. "A finding is clearly erroneous when there are no facts or inferences drawn therefrom that support it." *Id.* A judgment is clearly erroneous only if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.* "Thus, if the evidence and inferences therefrom support the trial court's decision, we must affirm." *Id.* On appeal, we do not reweigh the evidence or judge the credibility

of witnesses but view only the evidence and its reasonable inferences most favorable to the judgment. *In re T.S.*, 906 N.E.2d at 804.

*B. Allegedly Erroneous Findings of Fact*

[36] O.E.W. contends that two of the juvenile court's findings of fact are clearly erroneous. These allegedly erroneous findings provide:

> 11. Following the execution of the search warrant, [O.E.W.] was interviewed on scene by Hammond Police. [O.E.W.] claimed to have received the black Samsung cell phone from [M.C.] approximately two weeks prior to August 23, 2017.
>
> 12. On August 23, 2017, Detective Carter went to McDonald's on Kennedy Avenue in Hammond, Indiana to conduct an interview with [M.C.], who is employed at said business. [M.C.] denied being with [O.E.W.] at Hessville Park on August 21, 2017. [M.C.] indicated that he was working on [the] evening of August 21, 2017 and provided a copy of his time sheet to establish the same. Said individual also denied ever providing [O.E.W.] with any cell phone, specifically within the last two weeks.

Appellant's App. p. 91–92.

[37] O.E.W. claims that there was no testimony or evidence presented at the probable cause hearing to support these findings. The State counters that this information was included in the probable cause affidavit submitted to the court when seeking approval to file the delinquency petition against O.E.W. The State also notes that some of this information was included in the testimony of Detective Ford and Lt. Tharp during the suppression portion of the hearing.

[38]     We need not decide whether the juvenile court could consider the probable cause affidavit that had previously been filed but was not admitted at the probable cause hearing because, even assuming that these findings were clearly erroneous, the remaining findings are more than sufficient to support the juvenile court's ultimate probable cause determination. Erroneous factual findings are not fatal to the judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law. *Shelby's Landing-II, Inc. v. PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship*, 65 N.E.3d 1103, 1111 (Ind. Ct. App. 2016) (citing *Curley v. Lake Cnty. Bd. of Elections & Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008), *trans. denied*). Here, as set forth below, the remainder of the juvenile court's findings are supported by sufficient evidence, and these findings support the court's conclusion that there was probable cause to believe that O.E.W. committed the acts alleged in the delinquency petition.

### C. Probable Cause to Believe that O.E.W. Committed the Acts Alleged in the Delinquency Petition

[39]     The juvenile court determined that there was probable cause to believe that O.E.W. committed acts that, if committed by an adult, would be felony murder, robbery resulting in serious bodily injury, and theft. The felony murder statute provides that "[a] person who knowingly or intentionally kills another human being while committing or attempting to commit . . . robbery . . . commits murder, a felony." Ind. Code § 35-42-1-1(2). The robbery statute provides that "[a] person who knowingly or intentionally takes property from

another person or from the presence of another person . . . by using or threatening the use of force . . . or by putting any person in fear" commits robbery, which is a "Level 2 felony if it results in serious bodily injury to any person other than the defendant." Ind. Code § 35-42-5-1(a). And the theft statute provides that a person who "knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class A misdemeanor." Ind. Code § 35-43-4-2(a).

[40] Here, the juvenile court found the following facts relevant to a determination of probable cause. Gonzales was found murdered in her home, and her cell phone was missing. O.E.W. was unaccounted for over a period during the night Gonzales was murdered. He claimed to have been stabbed during an altercation at a local park. O.E.W.'s girlfriend, however, had seen him near the scene of the crime, where O.E.W. had purchased marijuana in the past. O.E.W. had told his girlfriend earlier that day that he planned to purchase more marijuana from Gonzales's boyfriend, Vera. When confronted about his injuries, O.E.W. initially lied and stated he had been in a bicycle accident. The two people with whom O.E.W. had allegedly fought in the park denied having been at the park. When the police executed a warrant to search for Gonzales's missing phone, they found the phone underneath a pillow where O.E.W. had been sleeping. The phone had connected to Gonzales's wi-fi network on the night of her death, then to networks associated with O.E.W. the next day. The police found a knife and crowbar in the area where O.E.W.'s girlfriend had seen him run after leaving the

area near Gonzales's home, and Gonzales's injuries were consistent with being stabbed and bludgeoned. When the police executed a search warrant at O.E.W.'s home, they seized a pair of underwear O.E.W. had been wearing on the night of the murder. Subsequent DNA testing of the underwear revealed DNA matching that of Gonzales. DNA testing of the shirt worn by Gonzales when she died contained DNA with a Y chromosome matching that of O.E.W. or his paternal ancestors and relatives. *See* Appellant's App. pp. 94.

[41] From this evidence, the juvenile court properly concluded that there was probable cause to believe that O.E.W. took Gonzales's phone from her by force and that she died as a result. These acts would be theft, robbery resulting in serious bodily injury, and felony murder if committed by an adult. Whether this is sufficient to prove to a jury beyond a reasonable doubt that O.E.W. committed these crimes is yet to be decided. All that the juvenile court determined here is that there was sufficient evidence to support a determination of probable cause that O.E.W. committed these acts.

[42] O.E.W.'s argument that the juvenile court overlooked evidence that suggested Vera might be involved are simply a request that we view evidence not favorable to the juvenile court's decision, reweigh the evidence, and come to a different conclusion. This is not our role as an appellate court. *See In re T.S.*, 906 N.E.2d at 804; *In re D.S.*, 910 N.E.2d at 840.

[43] We also reject O.E.W.'s argument that, because the juvenile court found that there was insufficient evidence to support a finding of probable cause that he

committed what would be knowing or intentional murder if committed by an adult, there was necessarily insufficient evidence for a finding of probable cause that he committed the other acts alleged in the delinquency petition. As our supreme court has recognized in the context of a jury verdict in a criminal case, inconsistent verdicts "are not subject to appellate review on grounds that they are inconsistent, contradictory, or irreconcilable." *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010). Seemingly logically inconsistent verdicts may be due to a fact-finder's choice to exercise lenity even if there is sufficient evidence. *Id*. at 648. Indiana jurisprudence recognizes a fact-finder's use of lenity as "an important component of our criminal justice system." *Id*. at 649. We see no reason not to apply the same reasoning to a trial court when acting as the trier of fact. Thus, the only issue for us on appeal is whether there was sufficient evidence to support the juvenile court's probable cause determination, not to judge the logical consistency of the court's judgment. *See id*.

[44] Moreover, the juvenile court's probable cause determinations are not necessarily inconsistent. The juvenile court could have concluded that the evidence supported a probable cause determination that O.E.W. took the phone from Gonzales by force and that she died as a result of this force, but that O.E.W. did not act intentionally (that is, with the conscious objective to kill Gonzales) or knowingly (that is, with an awareness of a high probability that he would kill Gonzales). *See* Ind. Code § 35-41-2-2 (a), (b).

[45] In summary, the evidence supporting the juvenile court's order is sufficient to support the court's determination that there is probable cause to believe that

O.E.W. committed the acts that, if committed by an adult, would be theft, robbery resulting in serious bodily injury, and felony murder. We therefore affirm the juvenile court's probable cause order.[10]

# Conclusion

[46] With regard to the State's appeal, we conclude that the juvenile court did not err as a matter of law by concluding that O.E.W. was subject to custodial interrogation when the police questioned him regarding his knowledge of Gonzales's death. We therefore affirm the juvenile court's order on O.E.W.'s motion to suppress. With regard to O.E.W.'s cross-appeal, we conclude that the juvenile court did not clearly err when it found that the evidence is sufficient to show that there is probable cause to believe that O.E.W. committed acts that would be felony murder, robbery resulting in serious bodily injury, and theft if committed by an adult. Accordingly, we also affirm the juvenile court's order finding probable cause.

[47] Affirmed.

May, J., concurs.

Brown, J., concurs in part and dissents in part with a separate opinion.

---

[10] O.E.W. makes no challenge to the remaining requirements for waiver contained in Indiana Code sections 31-30-3-4 and 31-30-3-2. He only challenges the juvenile court's determination that there is probable cause that he committed the acts alleged.

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant/Cross-Appellee-Petitioner,*

v.

O.E.W.,

*Appellee/Cross-Appellant-Respondent.*

Court of Appeals Case No.
18A-JV-2409

**Brown, Judge, concurs in part and dissents in part with opinion.**

[48] I concur with the majority's conclusion in Part II and would affirm the juvenile court's probable cause order. However, I respectfully disagree with Part I of the opinion in that I do not find that O.E.W. was in custody at the police station.

[49] First, I would not find that O.E.W.'s mother came to the station at the request of police. She knew Detective Suarez personally and initiated contact with him. In response to being asked "[a]nd so as a result of your conversation with Detective Suarez, you came down to the police department," she stated, "[c]orrect." Transcript Volume II at 15. This exchange immediately followed her statement, when asked what led to the phone call with Detective Suarez, that:

I was just concerned about what happened to my son and all the crimes that had happened, because of the person who, you know, who my son said did it. So I was concerned that he might know of something that happened, because he knew the boy who did that to him, you know, so, I just felt like he needed to talk.

*Id.*

[50] As to how the issue of the "murder that had occurred" came up, O.E.W.'s mother testified that she told the officers the same thing she had told Detective Suarez and that she "was just like, you know, due to what happened to my son and what the events that occurred in the neighborhood, he could, might know something, because of what – the person who attacked him, you know." *Id.* at 17. When asked if, "[t]o [her] recollection, all they were asking is if he had information or knew anything about this incident, correct," she answered affirmatively and stated: "And I always thought the whole time it was just because of what happened to him, they were trying to figure out, like, could that boy be connected. I never knew, you know . . . ." *Id.* at 19-20. She further answered in the negative when asked both if she specifically recalled an officer asking O.E.W. his whereabouts that evening and if she recalled O.E.W. being asked if he had committed the homicide.

[51] During Detective Ford's direct testimony, in response to whether he began a line of questioning related to Gonzales's murder, he answered "[s]omewhat" and continued:

I mean, basically, murder investigations are somewhat delicate, and, like I said, I didn't have a lot of knowledge of the

investigation in and of itself, so they were more open-ended questions to elicit anything that if he did have any specific information or – like I said, I didn't have a lot of information, so really it was just some brief, you know, even if he knew the people and some open-ended questions to see if there was any information that would help with that investigation down the road.

*Id.* at 31. He indicated that, when leaving the interview, nothing "overwhelmingly said that [O.E.W.] was really any part of" the homicide in terms of his demeanor or answers. *Id.* at 34. During the redirect examination, he stated that he "wouldn't say that" he agreed that, upon leaving the station that evening, O.E.W. became a potential suspect in the murder investigation, and he testified that he "actually thought it was just a bizarre incident." *Id.* at 40-42.

[52] Ultimately, I would find that O.E.W. presented at a police station as a "victim of a stabbing" at Hessville Park, and at the July 23, 2018 hearing, all three of his witnesses in support of his motion to suppress testified as such. *See id.* at 26 (Detective Ford stating that, "[f]or [O.E.W.'s] case, he was the – we believed at the time, a victim of a stabbing); *accord id.* at 9-10 (O.E.W.'s mother responding affirmatively when asked both if, at the time she took him into the station, she was under the impression that he was the victim of a stabbing and if she was there only "to report . . . a perceived crime" against him), 46 (Lieutenant Tharp agreeing that O.E.W. "may have been . . . the victim of a stabbing").

[53] In the context of a purported victim showing up at the police station and being asked, in a room with a door that remained open, first about his injuries and

eventually about certain events that occurred in the neighborhood, I would conclude that O.E.W. was not in custody. *See State v. Brown*, 70 N.E.3d 331, 336 (Ind. 2017) ("The test of whether a defendant is in custody is not whether a defendant feels free to go, but rather whether there was a '"formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest'.") (quoting *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3519 (1983))).

For these reasons, I respectfully dissent as to Part I of the opinion.